ILLINOIS POWER COMPANY, Petitioner-Appellant, v. ILLINOIS COMMERCE COMMISSION, Respondent-Appellee.

Third District   No. 3—92—0284

Opinion filed April 22, 1993.

Christine D. Wright, of Schiff, Hardin & Waite, of Chicago (Owen E. MacBride, of counsel), for petitioner.

Roland W. Burris, Attorney General, of Springfield (James E. Weging, Special Assistant Attorney General, of Chicago, of counsel), for respondent.

JUSTICE BARRY delivered the opinion of the court:

This proceeding was initiated on May 25, 1988, when the Illinois Commerce Commission (Commission) issued an "Order Commencing Reconciliation Proceedings" pursuant to section 9—220 of the Public Utilities Act (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 9—220 (now 220 ILCS 5/9—220 (West 1992) with 1991 amendments not involved herein)). Illinois Power Company (Illinois Power) was directed to reconcile the costs recoverable through its purchased gas adjustment clause (PGA) and fuel adjustment clause (FAC) and the revenues billed under PGA and FAC charges during the 12 months ended December 31, 1987. The Commission also directed Illinois Power to demonstrate that its fuel, power and gas supplies purchased during the reconciliation period were prudently purchased.

After receiving several volumes of evidence, the Commission ruled that certain nuclear fuel decisions were imprudent and led to unnecessary carrying charges of $29,252,437, thereby disallowing those costs. Additional rulings by the Commission concerning the reconciliation of the costs of natural gas and of electric fuel other than nuclear fuel are not at issue on appeal.

Illinois Power originally planned to construct a two-unit nuclear power plant at Clinton, Illinois, at a total cost of $429,438,000 with Unit 1 to be in commercial operation by June of 1980 and Unit 2 to be operational in June of 1982. After the Three Mile Island nuclear plant accident in 1979, nuclear power plant construction came under increasingly stringent requirements. Unit 2 was subsequently cancelled. Numerous construction delays resulted in Unit 1 beginning commercial operations on April 24, 1987, at a final cost of $4,224,600,000, nearly 10 times the original cost forecast.

Some understanding of the nuclear fuel cycle is necessary before reviewing the fuel procurement actions of Illinois Power. As described in the record, the nuclear fuel cycle involves four steps: uranium ore, conversion services, enrichment services, and fabrication services. The first is the production of natural uranium in the form of uranium concentrates produced by a mining and milling process. The second step is the conversion process by which the solid uranium concentrates are

converted into a gas (UF6) for the enrichment stage. Enrichment results in the separation and concentration of the fissionable isotope U235 of natural uranium from the nonfissionable isotope U238. Enriched uranium is then converted back to a solid and, at the fabrication facility, is converted into UO2 powder, which is first processed into pellets and then loaded into metal rods that are bound together in fuel bundles. The fuel bundles are plant-specific and cannot be sold for use in other facilities. The bundles are then ready to be loaded in the reactor, where they produce energy for at least three years. The average length of time to process uranium into fuel bundles is 12 to 18 months, and under Illinois Power's contracts, the uranium concentrates were required to be at the conversion facility 12 months before the fuel bundles would be ready for loading into the reactor.

Robert E. Alsop, the fuel buyer for Illinois Power responsible for purchasing nuclear fuel and related services and for administration of fuel contracts, testified as to the company's nuclear fuel procurement chronology. After the development of fuel specifications, bids were received from five competing suppliers. On December 28, 1972, a contract was signed with General Electric (GE) for fuel fabrication services for the initial core and for reload bundles as well. The schedules in the fabrication contract were based upon a 1980 start-up date for Unit 1 and a 1982 date for Unit 2. The contract also provided for some flexibility in delivery schedules, as follows: (1) at any time more than 30 months before the scheduled delivery date, delivery could be deferred indefinitely; (2) from 30 months to 18 months before scheduled delivery, the delivery date could be deferred for up to three months; (3) from 14 months to 18 months before the scheduled delivery date, delivery could be deferred for up to an additional three months; and (4) within 14 months of the scheduled delivery date, no further delay was allowed.

The GE contract also required that two-thirds of the enriched uranium be delivered to GE five months before the shipment date for the fabricated assemblies, and the remaining one-third be delivered to GE four months before the shipment date. The original shipment date was August 31, 1979, for Unit 1. As early as November 1973, Illinois Power notified GE that the start-up date of Unit 2 had been delayed one year.

In May of 1974, Illinois Power entered into two long-term fixed commitment uranium enrichment contracts with the only vendor available to utilities within the United States, the Atomic Energy Commission (AEC), later succeeded by the United States Department of Energy (DOE). Each contract required a 10-year fixed commitment

for enrichment services with no flexibility to change dates or amounts.

In April of 1975, Illinois Power entered into a contract with Kerr-McGee Nuclear Corporation (Kerr-McGee) for 2,720,000 pounds of uranium and for conversion to 1,041,020 kilograms of UF6. The contract provided for fixed delivery dates with the uranium to be delivered in 1976, 1977, and 1978, and the UF6 to be delivered in 1978 and 1979.

In November of 1974, Unit 1 start-up date was deferred to June 1981, and Unit 2 start-up was deferred to 1984. Additional deferments of the starting dates occurred, as follows:

On December 14, 1976, Unit 1 was deferred to December 1981.

On February 11, 1977, Unit 2 was deferred to 1988.

On April 13, 1978, Unit 1 was deferred to December 1982.

On December 5, 1980, Unit 1 was deferred to August 1983.

As these delays occurred, Illinois Power negotiated contractual adjustments to accommodate the postponements of start-up dates. In 1979, the DOE converted the two long-term fixed commitment enrichment contracts to adjustable contracts so that the schedule ran from 1982 to 1986 for Unit 1 and from 1987 to 1991 for Unit 2, thus corresponding with start-up dates of 1982 and 1988, respectively.

By the time the last of these delays was announced (December 5, 1980), Kerr-McGee had already delivered 374,800 kgs. of UF6 to Illinois Power. In April of 1981, Illinois Power made the final deferment allowable under the fabrication contract with GE, changing the shipment date to October 1982 in preparation for a January 1983 fuel load date in advance of the August 1983 date for commercial operation. On October 31, 1981, the 374,800 kgs. of UF6 were sent to DOE for enrichment. GE required the enriched material by May of 1982, and DOE required 180 days' advance notice before shipment to GE.

Thus the fuel cycle was underway when the first of 10 stop work orders were issued by Illinois Power in January of 1982. As a result, in April of 1982 commercial operation of Unit 1 was deferred to August of 1984, and a year later, the start-up date was deferred to November 1986. In May of 1982, enrichment was completed by DOE, and the enriched UF6 was sent to GE. Illinois Power then entered into a storage agreement with GE for the initial core fuel bundles, the fabrication of which was completed by October of 1982. The bundles were then stored.

During October and December of 1982, Illinois Power sold to other public utilities the 1984 enrichment services for which it had contracted. During 1984, Illinois Power was able to sell excess enrich-

ment services for 1985 and 1986. After Unit 2 was cancelled in 1983, Illinois Power cancelled the portion of the GE fuel fabrication contract that serviced Unit 2.

In a separate proceeding, the Commission conducted its construction audit and concluded that there was a total of $712,248,000 in unreasonable construction costs resulting from 18 months of delay associated with the 1982 stop work actions and from a three-month post-fuel load delay. The Commission's determination of unreasonably incurred construction costs was affirmed by this court in *Illinois Power Co. v. Illinois Commerce Comm'n* (1991), 208 Ill. App. 3d 779, while other portions of the Commission's order were reversed. Our judgment in that case was subsequently vacated by the Illinois Supreme Court and the cause remanded to this court for further proceedings consistent with *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1991), 146 Ill. 2d 175. (144 Ill. 2d 633 (March 1992).) Upon remand, the parties agreed to a settlement of pending issues, and the appeal was vacated on December 12, 1992.

In the fuel cost reconciliation proceeding, the Commission received extensive evidence from Illinois Power officials, from an expert witness testifying on behalf of Illinois Power, and from Dan Jenkins, a staff accountant with the Commission. The Commission's 35-page order summarized the evidence received, analyzed Illinois Power's nuclear fuel costs, and concluded that Illinois Power acted imprudently in incurring $29,252,436 of nuclear fuel carrying charges prior to commercial operation of the Clinton power plant.

The Commission adopted the following definition of "prudence":

"Prudence is that standard of care which a reasonable person would be expected to exercise under the same circumstances encountered by utility management at the time decisions had to be made. In determining whether a judgment was prudently made, only those facts available at the time judgment was exercised can be considered. Hindsight review is impermissible."

In its order the Commission refers to the avoidable construction delays previously determined in the construction audit proceeding, as follows:

"After reviewing all the evidence in this record, the Commission finds that while avoidable delays in the construction of Clinton is [*sic*] not the issue, there is a logical, natural connection between the Clinton construction delays and the incurring of additional carrying costs. In this instance IP [Illinois Power] management only had to deal with the Clinton station. IP per-

sonnel making nuclear fuel decisions would have to have been aware of the Clinton construction problems and the potential for delays. Construction decisions would have an obvious carryover to nuclear fuel costs and resulting carrying charges. IP continually extended the completion date for Clinton both prior and subsequent to April 1982. In the exercise of prudent management, IP should have more closely tracked the construction delays so that Respondent [Illinois Power] would not have run out of options in 1982 with respect to the completion of the nuclear fuel assemblies. The imprudent management of Clinton construction is so intertwined with the nuclear fuel process that IP's management must be considered to have acted imprudently in both its construction and fuel processing decisions at the times considered relevant in the entire process required to put Clinton in-service. This record shows that IP was imprudent in the activities related to the management and procurement of nuclear fuel for Clinton. The fact is that if IP had placed Clinton in-service at an earlier date, additional carrying costs would not have been incurred."

The Commission then determined that the delay period due to imprudent management of nuclear fuel costs was 21 months, the same period of unreasonable delay found in the construction audit case.

The scope of review of orders of the Commission is limited under the Public Utilities Act. (*Citizens Utilities Co. v. Illinois Commerce Comm'n* (1971), 50 Ill. 2d 35, 276 N.E.2d 330.) Section 10—201(d) provides in part:

"The findings and conclusions of the Commission on questions of fact shall be held prima facie to be true and as found by the Commission; rules, regulations, orders or decisions of the Commission shall be held to be prima facie reasonable, and the burden of proof upon all issues raised by the appeal shall be upon the person or corporation appealing from such rules, regulations, orders or decisions." Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—201(d).

Section 10—201(e) also provides in part:

"(e) Powers and duties of Reviewing Court:

* * *

(iv) The court shall reverse a Commission rule, regulation, order or decision in whole or in part, if it finds that:

A. The findings of the Commission are not supported by substantial evidence based on the entire record of evidence pre-

sented to or before the Commission for and against such rule, regulation, order or decision; or

B. The rule, regulation, order or decision is without the jurisdiction of the Commission; or

C. The rule, regulation, order or decision is in violation of the State or federal constitution or laws; or

D. The proceedings or manner by which the Commission considered and decided its rule, regulation, order or decision were in violation of the State or federal constitution or laws, to the prejudice of the appellant." Ill. Rev. Stat. 1987, ch. 111$\frac{2}{3}$, par. 10—201(e).

Illinois Power first contends that the Commission exceeded the scope of its authority under section 9—220 when it based its decision to disallow 21 months of carrying charges on the fact that the construction work had been imprudently managed rather than limiting itself to the question of whether its fuel purchases were prudent. Illinois Power does not argue that the carrying charges are outside the Commission's jurisdiction, as the Commission claims, but rather insists that the Commission went beyond its statutory authority in using the imprudent construction management as the grounds for disallowing part of the carrying charge portion of the fuel costs.

Illinois Power's second contention is that the Commission's finding that nuclear fuel procurement decisions were imprudent and led to avoidable carrying charges is not supported by the evidence in the record. Illinois Power argues that the contracts were shown to have been prudent at the time executed, that management of the contracts was prudent in the face of delays, and that the scheduled deliveries were reasonable in view of what was known at the time they were scheduled. Furthermore, Illinois Power says the evidence does not support the finding that Illinois Power could have anticipated the 1982 and 1983 construction delays early enough to have avoided carrying charges on the fuel. A finding that the January 1983 fuel load date was not prudent when fixed in December of 1980 is also argued not to be supported by evidence.

The Commission's order is somewhat ambiguous as to the extent to which it relied upon imprudent construction management in determining that fuel purchases were imprudently managed. One sentence in the order states that Illinois Power's "imprudent management of construction is so intertwined with the nuclear fuel process that IP's [Illinois Power's] management must be considered to have acted imprudently in both its construction and fuel processing decisions." However, that sentence cannot be read as standing alone. The same

paragraph includes a finding that Illinois Power should have tracked the construction delays more closely so that the fuel assemblies could have been deferred in 1982, and a later paragraph states very explicitly, "The January 1983 fuel load date was not prudent and properly established by IP's [Illinois Power's] management."

■ We agree with Illinois Power that the Commission cannot lawfully rule that the fuel management must have been imprudent solely because the construction management was imprudent. We also agree with Illinois Power that, to determine prudence, the contracts, decisions, and actions that make up fuel procurement and management must be reviewed in the light of the facts available at the time they occurred or were made. However, after reviewing the entire order, we conclude that the Commission based its decision substantially upon its findings of imprudent fuel procurement decisions, many of which were made in response to construction delays. The Commission did not base its decisions solely on imprudent construction management and did not act outside the scope of its statutory authority.

■ The next question is whether the Commission's findings of imprudent fuel procurement and management are supported by substantial evidence. The scope of review of findings of fact has been held to be "limited to reviewing whether the Commission set out findings of fact supporting its decision and whether the findings are against the manifest weight of the evidence." (*People ex rel. Hartigan v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 120, 142, quoted with approval in *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1989), 136 Ill. 2d 192, 204.) Hence, we must examine the key findings of fact contained in the Commission's order.

The Commission relied upon staff findings that Illinois Power should have anticipated lengthy stop work actions because many of those issued in 1982 and 1983 were the result of earlier problems that had not been corrected. The Commission's order stated:

"Staff also found over 100 separate QA problems at Clinton which were identified prior to April 1981. The Commission agrees with Staff's position. The January 1983 fuel load date was not prudent and properly established by IP's management. It would have been unrealistic for IP's management to believe that fuel loading at Clinton I would occur in January of 1983."

April 1, 1981, was the date Illinois Power exercised its last right of deferral under its contract with GE and deferred shipment of fuel bundles to October 1982, the date necessary to meet the January 1983 fuel load date which preceded the planned commercial operation

scheduled for August of 1983. Thus, the critical question was whether August 1983 was prudently scheduled in December of 1980 when that start-up date was set. By looking at the April 1981 date in its order as quoted above, the Commission overlooks the 1980 date when the crucial determination was made.

The record contains much technical information concerning quality problems at the construction site, but the seriousness of these problems did not become obvious until early 1981. There is no evidence that subsequent long-term construction delays could have been forecast in December of 1980. Furthermore, none of the construction delays occurring before 1982 were found to be imprudent or unreasonable by the Commission in its construction audit proceeding. Considering the knowledge available to Illinois Power management in December of 1980, and considering the necessary lead time between fuel load and commercial operation scheduled for August 1983, we conclude that the evidence is not sufficient to support the finding that the January 1983 fuel load date was not prudent at the time it was established.

Similarly, the Commission's finding that Illinois Power's management "should have tracked the construction more closely" is not supported by any evidence that management could have known far enough in advance of the delays that eventually occurred in 1982 and 1983 to have deferred fuel deliveries under the terms of the various fuel contracts. As indicated earlier, the fact that the construction work was imprudently managed cannot alone support a finding that the fuel procurement was also imprudently managed.

The Commission argues that Illinois Power acted imprudently when it sent enriched fuel to GE on May 31, 1982, for fabricating into fuel bundles after the start-up date had been postponed for one year in mid-April, particularly since Illinois Power did not discuss with GE the possibility of delaying the fabrication. However, the only evidence concerning the feasibility of attempting to renegotiate the GE contract supports the prudence of not opening such negotiations. One Illinois Power witness testified that GE had been wanting to renegotiate the contract because other provisions were very favorable to Illinois Power. Consequently, Illinois Power determined that terms of the existing contract could only be changed to Illinois Power's detriment. Other witnesses on behalf of Illinois Power stated that the contract with GE was very favorable to Illinois Power at the time made and that Illinois Power utilized the options for postponement of the performance dates as fully as was possible under the contract.

■ Furthermore, no evidence was before the Commission to support its contention that Illinois Power could have had more flexible delivery dates in its fabrication contract with GE. As already indicated, Illinois Power's expert witness testified that this contract, awarded after receiving bids, was very favorable to Illinois Power compared with other contracts being signed in the industry at that time and that it had appropriate flexibility in its provisions. Obviously the nuclear fuel cycle requires a long lead time.

The Commission could not rely solely upon the fact that the fuel bundles were fabricated and ready for loading in October of 1982 while the initial core load did not take place until September 1986 as evidence of imprudent fuel management. The Commission is required to determine prudence on the basis of what was known to management when it entered into the contract with GE in 1972 and when the various deferments were exercised between 1973 and April of 1981, not by what was clear to everyone in February of 1992.

There was no evidence contradicting Illinois Power's expert who testified that prudent fuel procurement and management must include having fabricated fuel available when needed for fuel loading. Considering the length of the fuel cycle, Illinois Power's management actions in 1980 and 1981 to assure availability of fuel bundles for the projected load date of January 1983 were not imprudent at the time they were made, and the Commission erred in finding to the contrary.

The other issues argued on appeal all related to the method used by the Commission to quantify the cost of the imprudent fuel management found by the Commission. Since we are reversing the findings of imprudence, we need not consider the alleged errors in calculation.

We reverse the order of the Commission and remand to the Commission for further proceedings consistent with this opinion.

Reversed and remanded.

STOUDER and SLATER, JJ., concur.