ILLINOIS POWER COMPANY, Petitioner, v. ILLINOIS COMMERCE COMMISSION *et al.*, Respondents.

Fifth District    No. 5—02—0065

Opinion filed April 1, 2003.—Motion to publish granted May 9, 2003.

Joseph L. Lakshmanan, of Illinois Power Company, of Decatur, and Owen E. MacBride, of Schiff, Hardin & Waite, of Chicago, for petitioner.

John P. Kelliher, Special Assistant Attorney General, of Chicago, for respondents.

JUSTICE MAAG delivered the opinion of the court:

Illinois Power Company (Illinois Power), the petitioner, seeks the review of an order that the Illinois Commerce Commission (Commission), the respondent, issued on November 27, 2001, finding that Illinois Power was imprudent in retiring its Freeburg, Illinois, propane plant. As a result of this finding, the Commission determined that the costs that Illinois Power incurred to obtain pipeline transportation capacity of the propane plant cannot be recovered from its customers. Illinois Power appeals. We reverse.

Pursuant to the Public Utilities Act (Act) (220 ILCS 5/1—101 *et seq.* (West 2000)), Illinois Power is statutorily required to reconcile revenues collected under its purchased-gas adjustment tariff with the actual cost of gas supplies prudently purchased for the 12 months ended December 31, 2000 (reconciliation period). The tariff clause provides for increases or decreases of the rates or charges of a public utility such as Illinois Power based on changes in Illinois Power's cost of purchased gas. 220 ILCS 5/9—220 (West 2000). Although the tariff clauses allow for automatic changes in rates without prior Commission approval, the General Assembly requires that the Commission initiate annual hearings to determine whether the clauses reflect the "costs of fuel, gas, power, or coal transportation purchased to determine whether such purchases were prudent." 220 ILCS 5/9—220(a) (West 2000). In each proceeding, the burden of proof is on the

utility to establish the prudence of its fuel, power, gas, or coal transportation purchases and costs. The standard under which the Commission assesses the prudence of a utility's gas purchases, pursuant to section 9—220 of the Act, is as follows: "Prudence is that standard of care which a reasonable person would be expected to exercise under the same circumstances encountered by utility management at the time decisions had to be made." *Illinois Power Co. v. Illinois Commerce Comm'n*, 245 Ill. App. 3d 367, 371, 612 N.E.2d 925, 929 (1993). When a court considers whether a judgment was prudently made, only those facts available at the time judgment was exercised can be considered. Hindsight review is impermissible. *Illinois Power Co.*, 245 Ill. App. 3d at 371, 612 N.E.2d at 929.

In the instant case, the Commission determined, in relevant part, that the evidence showed that, for the reconciliation period, Illinois Power acted reasonably and prudently in its purchase of natural gas, except with regard to its decision to retire the Freeburg propane plant.

In Illinois Power's case before the Commission, Frank Starbody, Illinois Power's director for gas supply, testified that he is responsible for the procurement of Illinois Power's natural-gas supply and pipeline capacity, the transportation of customer-owned natural gas, and Illinois Power's storage and transmission assets. Starbody testified that in 2000, Illinois Power purchased 55.2 million MMBtu of natural gas from various producers and marketers. Illinois Power also leased transportation and storage capacity via five interstate pipelines. Starbody stated that Illinois Power began the reconciliation period with eight underground gas-storage fields. One field was retired during the reconciliation period. Starbody said that Illinois Power designs its supply portfolio so that firm natural-gas supply is sufficient to meet requirements on a peak day. For 2000, Illinois Power reserved sufficient pipeline capacity and firm winter natural-gas supply to serve, along with the gas deliverable from Illinois Power's storage fields, the gas load expected in weather conditions equivalent to the coldest in the previous 20 years. Starbody also testified that Illinois Power began the reconciliation period with one propane plant facility with a peak-day deliverability equivalent to 20,000 MMBtu of natural gas. This facility was retired in 2000. As a result, during the reconciliation period, Illinois Power used existing propane inventory to operate the propane plant prior to its retirement and did not need to acquire additional supplies of propane during the reconciliation period.

Starbody claimed that in order to continue operating the Freeburg propane plant, substantial capital expenditures would have been required. The plant had obsolete compressor controls and switchgear, the fire-protection and gas-detection equipment did not conform to

current standards, and the insulation in the refrigerated sphere that holds the propane inventory required replacement. Starbody opined that regulatory requirements applicable to propane facilities could become more strict, thereby raising the concern that the substantial expenditures that would have been necessary to renovate the propane plant could prove insufficient within a few years. Starbody stated that the facility was grandfathered under earlier provisions of various codes and standards but that major upgrades to the facility, including those that were needed in 2000, could cause the facility to become subject to current versions of applicable codes and standards. This would require the propane plant to be brought into compliance with current codes and standards that would require additional capital expenditures.

Starbody was also concerned because the area around the Freeburg propane plant was experiencing significant growth in residential development. Starbody stated that the risks and consequences associated with gas leakage or fires that are inherent to propane facilities were a matter of increasing concern. Starbody claimed that the safety issues associated with the residential areas that were developing around the plant site were a significant factor in the decision to retire the plant.

Starbody also testified that operating a propane facility requires specialized training and experience that is unique to Illinois Power's system. The Freeburg facility was more complex than the types of propane plants described in the Commission staff's testimony because it included refrigeration, compression, and control equipment not present in other types of propane facilities. The need for specialized training and expertise, the infrequency with which the plant actually needed to be operated, and the resulting lack of hands-on experience for Illinois Power personnel were additional factors leading to the closing of the Freeburg facility. Starbody stated that Illinois Power had closed its four other propane plants prior to 2000, which left the Freeburg facility as the sole remaining propane plant. This provided fewer opportunities for hands-on operating experience and meant that operator training would be conducted solely to operate the Freeburg facility.

Starbody opined that even with extensive upgrades to the Freeburg facility, the reliability of the plant was a concern. The Freeburg plant was placed in service in 1971 in order to provide additional assurance of supply within Illinois Power's service area under conditions of high demand. At that time, natural-gas supplies and transportation were not readily available. Starbody stated that propane facilities are used only in extreme weather conditions and so have typically been operated only a few days each winter season. With normal mainte-

nance, there is a concern about the ability of equipment that is relied on only sporadically to operate reliably when called upon. Starbody said that from a reliability standpoint, firm transportation and supply contracts are preferable to maintaining propane plants.

Starbody testified that the cost of the capital improvements that would have been necessary in 2000 in order to renovate the Freeburg propane plant for continued use was $1.873 million and included work on the plant's control system, motor control center, insulation, and fire-protection systems and a new glycol heater, and new pumps.

Eric Lounsberry, the Commission's gas-section supervisor of the engineering department's energy division, testified that Illinois Power failed to provide sufficient documentation to support its decision to retire the Freeburg propane facility. Lounsberry stated that Illinois Power had failed to provide any information showing that it had performed an analysis necessary to make a prudent decision regarding the retirement of its propane facility. Lounsberry stated that absent such information, he was unable to determine that Illinois Power had made a prudent decision.

Lounsberry explained that a propane plant is a facility used by many gas utilities to provide peak capacity during periods of extremely cold temperatures. Propane plants generally consist of a large number of propane tanks and the associated equipment that allows for a propane and air mixture to be injected into a utility's natural-gas system. Lounsberry stated that Illinois Power had reported that its facility was installed in 1971 and that it now had obsolete refrigeration compressor controls and switchgear. Additionally, Illinois Power reported that the plant's fire-protection and gas-detection equipment did not conform to current standards and that the refrigerated sphere insulation was failing and needed to be replaced. Assuming the full operation of the plant, Illinois Power maintained a three-day supply of propane at the facility. Lounsberry stated that Illinois Power last used the Freeburg facility on December 21, 2000, for the purpose of depleting the propane inventory in order to allow for the abandonment of the facility. Lounsberry stated that although he requested that Illinois Power provide studies and analyses supporting its decision to retire the Freeburg plant, Illinois Power responded with "nothing but a list of the problems at its facility." Illinois Power reported that the cost to serve 20,000 MMBtu of firm gas transportation capacity on the Natural Gas Pipeline Company of America (NGPC), an amount equal to the daily capacity of the Freeburg propane plant, on an *annual* basis would be $1.273 million.

Lounsberry opined that almost all machinery can be repaired and kept in service if the owners and operators are willing to make the

necessary capital improvements and perform the necessary maintenance. He believed that Illinois Power's propane plant was such a project. Lounsberry testified that Illinois Power had not provided him with the cost of repairing the propane plant to keep it in service, even though he had requested the information. Lounsberry stated that since Illinois Power had failed to provide such information, he recommended that the Commission find Illinois Power's decision to retire the Freeburg propane plant to be imprudent and that the Commission disallow $1.273 million of the costs. This amount was the figure that Illinois Power had provided to Lounsberry as the cost to obtain 20,000 MMBtu of firm pipeline gas transportation capacity on the NGPC system for *one year*. We note that Lounsberry specifically requested the cost for *one full year*.

After hearing all the evidence, the Commission determined, *inter alia*, that the evidence showed that for the calendar-year 2000 reconciliation period, Illinois Power acted reasonably and prudently in its purchase of natural gas, except with regard to its decision to retire its Freeburg propane plant. The Commission concluded that an examination of the prudence of a utility decision in a purchased-gas adjustment tariff reconciliation proceeding should include an economic analysis unless the reasons supporting the utility's decision are so significant and persuasive that they render an economic analysis unnecessary. The Commission stated that an economic analysis should have been included in this reconciliation proceeding where the prudence of retiring the Freeburg propane plant was at issue. The Commission determined that the safety and reliability of the plant are legitimate concerns as the plant ages; however, the plant's past history over its 30-year life indicated that there have been very few problems affecting its safety and reliability. The Commission stated that safety and reliability were not so significant that they precluded a need for an economic analysis as a part of the decision on whether the plant should be retired. Finally, the Commission noted that according to the present-value-of-future-revenue-requirements (PVRR) analyses presented in this proceeding, Illinois Power's PVRRs for continued operation of the Freeburg plant are $5,630,160 for the 30-year period and $4,616,201 for the 15-year period. The Commission noted that these values most closely reflect its final position. The Commission stated that the primary dispute between Illinois Power and the Commission staff concerned the PVRRs for the retirement of the plant and the replacement of its capacity with a pipeline supply. The Commission staff claimed that the PVRRs for the retirement of the plant were $10,989,758 for the 30-year period and $8,056,872 for the 15-year period. The Commission staff's PVRR analysis results in PVRR sav-

ings for the continued operation of the plant of $5,359,598 over the 30-year period and $3,440,671 over the 15-year period. Illinois Power claimed that the PVRRs for the retirement of the plant were $5,297,160 for the 30-year period and $3,942,249 for the 15-year period. Illinois Power's base case PVRR analysis resulted in PVRR savings for the retirement of the plant of $333,000 over the 15-year period and $673,952 over the 30-year period. The difference between Illinois Power's PVRRs and the Commission staff's PVRRs for the retirement of the plant is due to the fact that Illinois Power assumed that it would need to buy pipeline firm transportation (FT) capacity for only the five winter months at an annual cost of $588,126, while the Commission staff assumed that Illinois Power would need to buy the pipeline FT capacity for all 12 months of the year at an annual cost of $1.273 million. The Commission staff noted that winter-only service is at a premium and that Illinois Power may not be able to receive a discount from maximum rates for winter-only service. Illinois Power acknowledged that it had found it difficult in the past to economically lease pipeline capacity on less than a 12-month basis, but it contended that the market had evolved so that it was economical to purchase FT capacity for the winter season (November through March), but at a premium over the summer season (April through October). The Commission noted that in determining whether it was prudent for Illinois Power to retire the Freeburg plant in early 2000, hindsight should not play a part. The Commission stated that the question that needed to be addressed is whether it was clear when Illinois Power made its decision to retire the Freeburg plant in April 2000 that Illinois Power could purchase pipeline capacity for only the winter season on an economical basis. Illinois Power acknowledged that is was "less clear" in April 2000 that such a purchase was possible than it had become by 2001. Since it was not reasonable prior to April 2000 to assume that it was economical for Illinois Power to purchase FT capacity for the winter season only, the Commission concluded that the Commission staff's PVRRs for the retirement of the Freeburg plant were reasonable and should be accepted. The Commission also determined that Illinois Power's PVRRs for the retirement scenarios rely on information that was not known at the time that the decision to retire the Freeburg plant was made and, therefore, constitute an impermissible hindsight analysis.

The Commission determined that the significant PVRR savings from the continued operation of the Freeburg propane plant of $5,297,160 for the 30-year period and $3,942,149 for the 15-year period outweighed the concern about the safety and reliability of the plant identified by Illinois Power as the plant continues to age. Finally, the

Commission concluded that Illinois Power's decision to retire the Freeburg plant in April 2000 was imprudent. The Commission stated that since Illinois Power's decision to retire the Freeburg plant was imprudent, Illinois Power should not be allowed to recover from its customers the cost of obtaining an amount of pipeline transportation capacity equal to the capacity of the Freeburg facility. The Commission then ordered Illinois Power to implement Factor O refunds of $900,195 for Rider A customers, $57,600 for Rider B demand customers, and $204 for Rider B commodity customers in its first monthly purchased-gas adjustment tariff filing after the date of this order. Illinois Power appeals.

Illinois Power claims that the Commission's overall conclusion that its decision to retire the Freeburg propane plant was imprudent hinges on three improper determinations that were "erroneous, flawed[,] and unreasonable." First, Illinois Power claims that the Commission improperly determined that in order to prudently determine whether to retire the 30-year-old facility, Illinois Power should have performed a PVRR analysis comparing the costs, over a period of 15 to 30 years, of continuing to operate the Freeburg plant versus the costs, over the same future period, of retiring the facility and replacing its capacity with alternative sources. Second, Illinois Power contends that the Commission erred in determining that the factors that Illinois Power had actually considered in deciding to retire the facility—such as age, safety, reliability, the need for capital expenditures, operator training concerns, and growth and development in the vicinity of the plant—were not sufficient bases for a prudent decision to retire the plant. Finally, Illinois Power complains that the Commission erred in its determination that the PVRR analysis must assume that replacement pipeline transportation capacity for the Freeburg plant could only be purchased on a year-round contract instead of for the five winter months, because it would not have been reasonable to assume in early 2000 that pipeline capacity could be purchased for just the winter months on an economical basis (even though this was known by the time the Commission had made its decision in this case). Illinois Power claims that this assumption, standing alone, had a sufficient impact to change the ultimate results of the PVRR analysis. Under the assumption that replacement pipeline capacity must be purchased for the entire year, the PVRR analysis showed that the retirement of the plant was the higher cost alternative but that under the "winter season only" assumption, the PVRR analysis showed that the retirement of the plant was the lower cost alternative.

▮ The standard of review in appeals from orders of the Commission is as follows:

"(d) *** The findings and conclusions of the Commission on questions of fact shall be held prima facie to be true and as found by the Commission; rules, regulations, orders[,] or decisions of the Commission shall be held to be prima facie reasonable, and the burden of proof upon all issues raised by the appeal shall be upon the person or corporation appealing from such rules, regulations, orders[,] or decisions." 220 ILCS 5/10—201(d) (West 2000). Section 10—201(e)(iv) states, in relevant part, that this court shall reverse a Commission rule, regulation, order, or decision, in whole or in part, if it finds that "[t]he findings of the Commission are not supported by substantial evidence based on the entire record of evidence presented to or before the Commission for and against such rule, regulation, order or decision." 220 ILCS 5/10—201(e)(iv) (West 2000). The Commission's order will be set aside if it appears that the Commission acted outside the scope of its authority or infringed on a constitutional right or that its findings are against the manifest weight of the evidence. *Citizens Utilities Co. of Illinois v. Illinois Commerce Comm'n*, 124 Ill. 2d 195, 206, 529 N.E.2d 510, 515 (1988). The findings of the Commission are only *prima facie* evidence that its orders are reasonable, but this court is not obligated to believe that the facts in evidence establish a given conclusion if the conclusion is not reasonable. *Thompson v. Illinois Commerce Comm'n*, 1 Ill. 2d 350, 356, 115 N.E.2d 622, 625 (1953). An administrative order will be set aside if it is "clearly unreasonable." *Monarch Gas Co. v. Illinois Commerce Comm'n*, 261 Ill. App. 3d 94, 101, 633 N.E.2d 1260, 1266 (1994).

The theory behind public utility regulation is that the Commission should fix rates that "might properly be supposed to result from free competition." *State Public Utilities Comm'n v. Springfield Gas & Electric Co.*, 291 Ill. 209, 218, 125 N.E. 891, 896 (1919). It is undisputed that the Commission sets rates in two ways—by base rates or by an automatic-cost-recovery mechanism. Base rates attempt to recover a utility's costs through estimating the total revenues necessary to recover its operating costs plus a cost of investor capital using a specific formula. *Citizens Utilities Co.*, 124 Ill. 2d at 200-01, 529 N.E.2d at 512-13. There are circumstances, however, where particular utility costs are unique enough that circumstances warrant a recovery through an automatic-cost-recovery mechanism. *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111, 138, 651 N.E.2d 1089, 1102 (1995). In *City of Chicago v. Illinois Commerce Comm'n*, 13 Ill. 2d 607, 150 N.E.2d 776 (1958), the Illinois Supreme Court highlighted the Commission's discretionary authority to allow a rate recovery for a utility's costs through a purchased-gas adjustment tariff. This authority was later codified at section 9—220 of the Act. 220 ILCS 5/9—220 (West 2000).

Illinois Power's main argument centers around the Commission's conclusion that the retirement of the Freeburg plant was erroneous because the Commission determined that a PVRR analysis was necessary for prudent decision-making even though the Commission had not required PVRR analyses in similar situations in the past. The Commission determined that the following standard should be used to assess the prudence of Illinois Power's decision to retire the Freeburg propane plant: "Prudence is the standard of care which a reasonable person would be expected to exercise under the same circumstances encountered by utility management at the time decisions had to be made." We also note, however, that the prudence standard recognizes that reasonable persons can have honest differences of opinion without one or the other necessarily being "imprudent." *Illinois Commerce Comm'n v. Commonwealth Edison Co.*, Ill. Com. Comm'n No. 84—0395 (October 7, 1987). Illinois Power claims that although the definition of prudence is correct, the Commission misapplied the definition by holding Illinois Power to a standard of care that was inconsistent with what the Commission had required in similar situations in the past. More specifically, the Commission determined that an examination of the prudence of a utility decision in a purchased-gas adjustment reconciliation proceeding should include an economic or PVRR analysis unless the reasons supporting the utility's decision are so significant and persuasive that they render an economic analysis unnecessary. The Commission also stated that it did not believe that the safety and reliability concerns were so significant that they precluded the need for an economic or PVRR analysis as a part of the decision on whether the plant should be retired.

On appeal, the Commission claims that it did not require a PVRR analysis as a part of prudent decision-making. In fact, the Commission states that it required either a PVRR analysis or some other form of economic analysis, which was nothing new because it had always required some form of economic analysis. However, the record does not support the Commission's position.

Both Illinois Power and the Commission staff agreed that the capital expenditures immediately needed in 2000 in order to continue the operation of the facility were at least $1.873 million. A review of the Commission's order shows that the Commission staff's recommendation that Illinois Power had acted imprudently in deciding to retire the Freeburg plant rather than incur the capital expenditure needed to renovate was expressly based on Illinois Power's failure to conduct a PVRR analysis. Lounsberry stated as follows:

"I agree the amount of capital expenditure should be reviewed in the context of whether the facility is economically viable versus the

available alternatives. However, IP failed to conduct such a review ***. *The proper comparison for these types of costs is a present value of revenue requirements ('PVRR') for each.* Since IP failed to conduct such an analysis, I prepared an analysis using the information available to me within this proceeding." (Emphasis added.) Neither the Commission nor its staff identified any other form of economic analysis, short of a PVRR analysis, that they would have considered sufficient to demonstrate prudent decision-making.

In its brief, the Commission points out that Illinois Power had conducted "some economic analyses" of the projects that it had approved as prudent in *Illinois Power Co.: Proposed General Increase in Gas Rates*, Ill. Com. Comm'n No. 93—0183 (April 6, 1994), and *Illinois Power Co.: Proposed General Increase in Electric Rates*, Ill. Com. Comm'n No. 91—0147 (February 11, 1992). In number 93—0183, the Commission considered whether numerous capital projects were prudent and reasonable and should be included in Illinois Power's gas rate base. One of these projects was the Hillsboro storage field expansion and pipeline project, which had a capital cost of $54.706 million (or 30 times the capital investment that was needed to continue to operate the Freeburg propane plant). In number 93—0183, Illinois Power conducted and presented a PVRR analysis of whether the Hillsboro storage field and pipeline project should be built as a part of showing the prudence of undertaking the project. In addition to the Hillsboro project, the Commission considered and allowed in the rate base eight other new capital projects, only one of which Illinois Power justified with a PVRR analysis. Each of the eight cases involved a capital expenditure equal to or in excess of the approximately $1.9 million expenditure that would have been required in 2000 to continue to operate the Freeburg facility. Pursuant to section 9—211 of the Act (220 ILCS 5/9—211 (West 2000)), the Commission could only include the costs of these projects in Illinois Power's rate base if it found that those costs were "prudently incurred." The Commission found all eight of the projects to be prudent and reasonable even though Illinois Power presented a PVRR analysis to justify only one of them.

In number 93—0183, one of the capital projects that was considered included the addition of the "construction tracking feature" and the "marketing and expanded services feature" to Illinois Power's customer information system. The Commission staff opposed its inclusion in the rate base because Illinois Power had not presented a net-economic-benefits analysis of those projects. However, the Commission rejected that argument and stated, "Staff's strict cost/benefit test for these features is an inappropriate standard that is not reflected in the *** Act." *Illinois Power Co: Proposed General Increase in Gas Rates*,

Ill. Com. Comm'n No. 93—0183, (April 6, 1994). The Commission went on to note that Illinois Power's evidence concerning the increased efficiency and the improved customer service that would result from those features justified the inclusion of the costs in the rate base.

In number 91—0147, the Commission indicated that Illinois Power had performed an economic-benefits analysis for the project at issue in that case, and the dispute was about the type or quality of the analysis that had been performed. More specifically, Illinois Power performed an analysis merely to determine how many years it would take before the project at issue began to produce savings, as opposed to a PVRR analysis over the life of the asset. The Commission stated that section 9—211 of the Act (220 ILCS 5/9—211 (West 2000)), which imposes a prudence test, does not set forth any specific types of analyses that a utility must perform. In fact, the Commission stated as follows: "While Staff proposes that a proper, *net present value* economic benefits test pertaining to BFMS [Business and Financial Management System] should have been performed by IP, *the Commission cannot conclude that failure to perform such a test is sufficient basis for excluding BFMS from rate base.* Therefore, Staff's proposed adjustment is rejected." (Emphasis added.) *Illinois Power Co.: Proposed General Increase in Electric Rates*, Ill. Com. Comm'n No. 91—0147 (February 11, 1992).

Illinois Power once operated five propane plants as a part of its gas system, but it had retired the other four propane plants prior to 2000. Two of the propane plants were retired in 1994 (*Illinois Commerce Comm'n v. Illinois Power Co.*, Ill. Com. Comm'n No. 95—0122 (December 9, 1998)), one plant was retired in 1995 (*Illinois Commerce Comm'n v. Illinois Power Co.*, Ill. Com. Comm'n No. 96—0035 (December 9, 1998)), and the other plant was retired in 1996 (*Illinois Commerce Comm'n v. Illinois Power Co.*, Ill. Com. Comm'n No. 97—0018 (November 5, 1998)). It is undisputed that the Commission's orders in the annual purchased-gas adjustment charge reconciliation proceedings conducted for each of those years do not show that any issue was raised with respect to the prudence of Illinois Power's decision to retire the other four propane plants. No issue was raised with respect to Illinois Power's failure to conduct PVRR analyses of whether to retire the propane plants or continue them in service. In fact, in each of these cases, the Commission's orders state that Illinois Power acted reasonably and prudently in its purchases of natural gas and transportation.

The Commission addressed this issue by stating that the retirement of the other four propane plants without the consideration of a PVRR analysis is not determinative of whether a PVRR analysis

should be a part of the decision to retire the Freeburg plant. The Commission stated, "There has been no showing that the circumstances for retiring the other four plants are the same as those pertaining to the retirement of the Freeburg plant." The Commission relies primarily on *Mississippi River Fuel Corp. v. Illinois Commerce Comm'n*, 1 Ill. 2d 509, 116 N.E.2d 394 (1953), to support its position.

In *Mississippi River Fuel Corp.*, the Commission had entered an order finding Mississippi River Fuel Corp. (MRFC) to be a public utility under the Act, based on its gas sales to retail customers. On appeal, the MRFC argued that the Commission was precluded from reaching this conclusion because in an earlier case, in 1948, the Commission had found that MRFC was not a public utility. The Illinois Supreme Court stated that the Commission was not precluded by its earlier order from reaching a different result in the case before it. However, the court then stated that although the 1948 Commission decision did not have the binding effect sought by Mississippi, it illustrated the fact that the Commission, by its inaction for a period of almost 20 years, construed the Act as not applicable to Mississippi. The court noted that even though the courts are not bound by the Commission's construction of the Act, "such a consistent and long-standing administrative interpretation cannot but have persuasive effect." *Mississippi River Fuel Corp.*, 1 Ill. 2d at 514, 116 N.E.2d at 397. The court then ruled that MRFC should *not* have been found to be a "public utility," and it reversed the Commission's determination to that effect.

In the instant case, the Commission failed to point out what relevant differences in circumstances existed between the retirement of the first four propane plants and the retirement of the Freeburg propane plant. It is undisputed that significant capital expenditures were needed to keep the plant operational and that there were legitimate safety and reliability concerns about the continued operation of the plant due to the growth in the development of the area surrounding the plant site and the trend of this growth continuing into the future, even though the Commission determined that those concerns were not sufficient to justify the retirement without a justification by a PVRR analysis. We note, however, that Starbody testified that he was not sure how one would quantify the dollar impact of the safety issues, for purposes of a quantitative analysis. In fact, the PVRR analysis presented by Commission staff included no quantification of the dollar impact of these safety issues, even though the Commission stated, in its order, that the "safety and reliability of the plant are a legitimate concern as the plant continues to age." Additionally, neither Illinois Power nor the Commission staff identified any

operating-cost savings at the propane plant that would result from the necessary capital expenditures. Illinois Power's testimony shows that operating and maintenance costs for the plant would continue to grow at a rate faster than the inflation rate.

We note, however, that in evaluating whether to retire the Freeburg propane plant in 2000, Illinois Power had the experience of retiring four propane plants within the preceding six years without conducting PVRR analyses and without being told by the Commission that PVRR analyses were necessary in order to show prudence in making such decisions. In fact, the prior Commission decisions and other experience would have led one to conclude that a PVRR analysis was not necessary with respect to this decision. Hence, in early 2000, when Illinois Power was deciding whether to retire its last remaining propane plant or to expend approximately $1.9 million in capital improvements and upgrades to keep the Freeburg plant operational, there would have been no reason, based on past experience, that a "reasonable person" should have concluded that a PVRR analysis was necessary as a part of prudent decision-making. In fact, section 9—220(a) of the Act does not set forth any specific type of analysis that a utility must perform to show that its costs are prudent. *Illinois Power Co.: Proposed General Increase in Electric Rates*, Ill. Com. Comm'n No. 91—0147 (February 11, 1992). We note that the Commission, in its order, pointed to no statutory provision or regulation of the Commission that required a PVRR analysis to establish prudence in these circumstances. Additionally, the Commission did not point to any prior decisions or any other sources of a "standard of care" that should have led a reasonable person to conclude that a PVRR analysis was a necessary component of prudent decision-making in deciding whether to invest more capital into the Freeburg plant or retire it. Although "prudence" is a determination within the Commission's discretion, the Illinois Supreme Court has stated, "[N]o matter how much discretion the Commission is afforded ***, its decisions are entitled to less deference when it drastically departs from past practice." *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 136 Ill. 2d 192, 228, 555 N.E.2d 693, 709 (1989). The Commission's decision in the instant case was such a departure. The Commission did not adopt a new standard or policy. It merely decided after the fact that a PVRR analysis should have been conducted in determining the prudence of an action that had already been taken.

■ From the foregoing facts, we find that the Commission created *after the fact* the standard of care a reasonable person should have followed in early 2000 when deciding whether to retire the Freeburg

plant, and it applied it in hindsight to judge the prudence of Illinois Power's actions. The Commission's finding that a PVRR analysis was required in the instant case was not supported by substantial evidence; hence, that finding was arbitrary and unreasonable. Therefore, Illinois Power was not "imprudent" for failing to conduct a PVRR analysis in order to substantiate its decision to retire the Freeburg propane plant.

■ Next, Illinois Power claims that it met its burden of proving that the retirement of the Freeburg facility was a reasonable and prudent decision based on the factors that it considered. We agree.

Regarding the decision on whether to retire the Freeburg propane plant, the record shows that Illinois Power considered the following: (1) the plant's age, (2) the plant's safety, (3) plant reliability concerns, (4) the need for significant expenditures on the facility for renovations and upgrades (immediately and in the future), (5) the growth and development trends in the Freeburg and Smithton areas of St. Clair County, (6) the fact that Freeburg was Illinois Power's last remaining propane plant, (7) the liability risk that the plant presented, and (8) the ability to replace the plant's capacity with an alternative that offered greater reliability, safety, flexibility, and convenience than the Freeburg propane plant.

A review of the record shows that the Commission considered each of the foregoing factors in isolation rather than considering them collectively in analyzing whether the retirement of the Freeburg propane plant was warranted. Such an analysis by the Commission was flawed, which resulted in an arbitrary and unreasonable finding that Illinois Power did not make a reasonable and prudent decision when it retired the Freeburg propane plant.

The Commission noted that Lounsberry's testimony showed that the closest "new residential development" was 4.3 miles from the propane plant site toward the town of Smithton. Additionally, the Commission staff claims that there should be no safety concerns because the threat to human safety from a catastrophic accident at the propane plant only extends for 1.75 miles. We note, however, that Starbody testified that "there are 27 houses along the road that runs from the plant site to the subdivision" that Lounsberry referenced. This includes eight homes within a mile of the plant site and another eight homes within two miles of the plant. Several of those homes had been built "within the last few years." The Freeburg village limits are 2.5 miles north of the propane plant site along Illinois Highway 13. The area extending approximately 1.4 miles south of Freeburg along Highway 13 had recently been rezoned from farmland to commercial. Highway 13, which runs by the propane site, had recently been widened and resurfaced, and a new bridge had been built on Highway

13 north of the plant. Starbody stated that Illinois Power based its decision not only on the proximity of development to the plant site currently but also on the likelihood that development would continue to move closer to the site over the 10 to 15 additional years that it would need to operate the propane facility in order to justify the approximately $1.9 million capital expenditure it was considering. Starbody opined that Lounsberry's dismissal of this issue on the ground that the closest development was currently 2.5 miles away in one direction and 4.3 miles away in another direction was inconsistent with his position that the decision to retire or continue to operate the propane plant should have been based on an analysis extending 30 years into the future.

The Commission staff claims in its brief that in response to a staff discovery request, Illinois Power provided two "maps," neither of which showed residential encroachment near the Freeburg plant. This misstates the record.

The Commission staff requested and Illinois Power provided aerial photographs of the area in question. Illinois Power provided the photographs that it had available, which had been taken on April 3, 1997, more than four years prior to the hearing in this case. Starbody explained that a number of the homes that are now located between the new residential development and the plant site are not shown on the aerial photograph because they were built within the last several years.

Additionally, Lounsberry's claim that the trend of the development in the area of the propane plant was not a factor that supported the retirement of the facility was inaccurate. Starbody testified that the populations of Smithton and Freeburg had grown considerably since 1970 when the Freeburg plant was originally built. Starbody stated that the development in the area would continue to increase because Freeburg is close to St. Louis. Starbody pointed out that commercial areas on the Illinois side of the Mississippi River are developing. He also focused on the ease of commuting, the recent availability of commuter rail transportation to St. Louis, the attractiveness of the area as a "bedroom" community, the fact that new homes continued to be built in locations increasingly closer to the propane plant site, the recent rezoning of the area from the Freeburg limits to within about one mile from the plant from "farmland" to "commercial," and recent improvements to the State highway that runs south from Freeburg, through the rezoned area, past the propane plant.

The Commission claims that if Illinois Power was concerned about the trend of the development in the area of the propane plant for 10 to 15 years into the future, it should have conducted an economic analysis

of the necessary capital expenditures over the 10-to-15-year period. The record shows that although Starbody testified that Illinois Power was concerned about the continuing trend of development in the area over the next *10 to 15 years*, Lounsberry's PVRR analysis assumed that Illinois Power would need to operate the Freeburg plant for *another 15 to 30 years* in order to recover the $1.873 million capital expenditure that the plant needed in 2000. Additionally, the PVRR analysis that was presented by the Commission staff made no provision for any additional capital expenditures on the propane plant in order to keep it operating over the 15-to-30-year period covered by the study. Illinois Power estimated that additional capital expenditures of $200,000 every three years would be needed, and it identified a number of specific capital projects to replace or renovate the plant components that would have been needed over the next several years had the facility continued to operate. Starbody testified that it was uncertain how to quantify the dollar impact of the safety issues for purposes of a quantitative analysis. The Commission staff's PVRR analysis, which the Commission accepted as dispositive in its order, incorporated no quantification of these issues. In fact, the only way that Illinois Power could have eliminated the risks associated with the continued growth in the area would be to buy all of the real estate for some distance around the plant, which would impose additional costs.

Additionally, Illinois Power retained Packer Engineering (Packer) to perform an independent safety analysis of the Freeburg facility. The Commission ignored the finding by Packer that an explosion at the propane plant would damage buildings up to three miles away. Packer pointed out that the distance from the facility to the nearest community was not a sufficient buffer zone to protect the residents from injury and/or property damage. Packer also noted that the risks associated with propane accidents are not limited to residences and businesses in the surrounding area but also affect plant employees and emergency response personnel. Dr. Ogle, a Packer employee, testified that when accidents have occurred at other propane facilities, it has often been employees and emergency response personnel who have been injured or killed, rather than bystanders in the area. Packer also noted that the area from Freeburg to about one mile from the propane plant had recently been rezoned from farmland to commercial and that this suggested that commercial development would occur in that area. Finally, Packer estimated that filling the 800,000-gallon propane storage vessel, which provides enough inventory to operate the facility for three days, requires deliveries of propane by 90 tanker trucks. Therefore, the continued operation of the Freeburg facility would necessitate considerable travel through the surrounding area by tanker

trucks loaded with propane. These are some of the factors that Illinois Power used to make its decision to close the Freeburg facility.

Based on the foregoing facts, Illinois Power made a decision that it did not want to be responsible, in an area of St. Clair County that is experiencing growth and development, for ensuring the safety of a facility storing 800,000 gallons of volatile, flammable liquid propane in a 30-year-old, above-ground structure that an expert concluded had probably exceeded its expected operating life. Additionally, the Freeburg propane plant was only needed about three days per year. The record shows that there are safer, more reliable, and more convenient alternatives for providing the same service to customers, even though it was estimated by the Commission to be more expensive. Hence, the Commission's conclusion that Illinois Power was imprudent in retiring the propane plant was unreasonable.

We need not address Illinois Power's final argument in this case, since we have determined that the Commission erred in finding that a PVRR analysis was necessary in this case.

For the foregoing reasons, we reverse the Commission's order with respect to its finding and conclusion that Illinois Power's decision to retire the Freeburg propane plant was imprudent, and we remand this case to the Commission with directions to enter an order consistent with this court's decision.

Reversed; cause remanded.

HOPKINS, P.J., and GOLDENHERSH, J., concur.