No. 2-23-0229
Opinion filed November 7, 2024

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| NORTH SHORE GAS COMPANY and THE PEOPLES GAS LIGHT AND COKE COMPANY, | ) ) ) ) | On Petition for Administrative Review from the Illinois Commerce Commission. |
| Petitioners, | ) ) | |
| v. | ) ) | ICC Case Nos. 20-0665 20-0666 |
| THE ILLINOIS COMMERCE COMMISSION and THE PEOPLE *ex rel.* KWAME RAOUL, Attorney General of the State of Illinois, | ) ) ) ) | |
| Respondents. | ) ) | |

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Presiding Justice McLaren and Justice Kennedy concurred in the judgment and opinion.

**OPINION**

¶ 1    Petitioners, North Shore Gas Company (North Shore) and The Peoples Gas Light and Coke Company (Peoples Gas) (collectively, the Companies), appeal from a decision by the Illinois Commerce Commission (Commission) following a reconciliation proceeding in which the Attorney General, Kwame Raoul, intervened, disallowing approximately $16.2 million of calendar year 2018 uncollectible expenses sought by the Companies, pursuant to section 19-145(c) of the Public Utilities Act (Act) (220 ILCS 5/19-145(c) (West 2022)). The Companies petitioned for direct administrative review of the Commission's decision. See *id.* § 10-201(a), (b); Ill. S. Ct. R.

335 (eff. July 1, 2017) (direct review of administrative orders by appellate court). They argue that the Commission's imprudence finding and its disallowance were not supported by substantial evidence. We affirm.

¶ 2                                                    I. BACKGROUND

¶ 3                              A. The Uncollectible Expense Adjustment Rider

¶ 4      The Companies are gas utilities serving about 1 million customers (Peoples Gas serves 867,600 customers in Chicago, and North Shore serves 159,000 customers in Cook and Lake Counties). The Act provides that a gas utility may establish an automatic adjustment clause tariff (*i.e.*, rider) for the collection of "uncollectibles" each year. 220 ILCS 5/19-145(a) (West 2022). A rider " 'is a cost recovery method. It generally alters an otherwise applicable rate and recovers a specific cost under particular circumstances. *** [A rider] often include[s] a reconciliation formula, designed to match revenue recovery with actual costs.' " *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2015 IL 116005, ¶ 9 (quoting *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111, 133 (1995)). Uncollectibles are those amounts that have been billed by a utility to customers but that remain unpaid and are eventually deemed by the utility to be uncollectible. The utility may recover uncollectibles from ratepayers, via a monthly surcharge. The Act permits a gas utility, at its election, to recover through a rider the incremental difference between its actual uncollectibles (as set forth in filings) and the uncollectibles included in the utility's rates for the relevant period. The Companies petitioned, and the Commission approved in 2010, proposed tariff changes, including the uncollectible expense adjustment rider (Rider UEA). Under Rider UEA, the Companies must annually petition to reconcile all amounts recovered via the rider with actual uncollectibles for the reporting year. 220 ILCS 5/19-145(c) (West 2022). If a gas utility elects, as here, to establish a rider, it must "pursue minimization of and collection of

uncollectibles through the following activities" set forth in the Act: (1) identify customers with late payments; (2) contact the customers in an effort to obtain payment; (3) provide delinquent customers with information about possible options, including payment plans and assistance programs; (4) serve disconnection notices; (5) implement disconnections based on the level of uncollectibles; and (6) pursue collection activities based on the level of uncollectibles. *Id.*

¶ 5     Under section 19-145 and Rider UEA, the Companies petition the Commission to initiate annual proceedings to review their uncollectibles generated during the calendar year two years earlier and to reconcile those amounts with the amounts collected through Rider UEA during the period from June through May beginning the previous year. *Id.* § 19-145(b). As part of the reconciliation proceeding, the Commission (1) conducts an accounting review and (2) reviews "the prudence and reasonableness of the utility's actions to pursue minimization and collection of uncollectibles," which must include the six activities noted in section 19-145(c). *Id.* § 19-145(c). Here, the Companies challenge the Commission's disallowance of a portion of their uncollectibles for 2018, based on its finding that they did not prudently and reasonably pursue minimization of uncollectibles.

¶ 6                     B. 2017 Customer Information System Upgrade

¶ 7     The Companies must comply with Commission rules concerning disconnection notices and disconnections. One rule, known as the winter disconnection moratorium, forbids gas utilities from disconnecting residential space heating customers for nonpayment of a bill or deposit each year from December 1 through March 31 of the following year. 83 Ill. Adm. Code 280.135, adopted at 38 Ill. Reg. 21,331 (eff. Nov. 1, 2014). Thus, the Companies have an eight-month window each year to disconnect residential customers for nonpayment.

¶ 8     In April 2017, the Companies implemented a new customer information system (CIS) upgrade to enhance customer service, billing, and service. They decided to temporarily suspend disconnections and certain other activities during the upgrade, which we will refer to as the 2017 disconnection moratorium. According to the Companies, the 2017 disconnection moratorium lasted four months (April to July) and was followed by a four-month ramp-up period (August to November), which then led into the annual statewide mandated winter disconnection moratorium (December to March). (The Attorney General contends that, pursuant to discovery requests, the Companies represented that they suspended disconnection activities for one year (see *infra* ¶ 19).

¶ 9     Prior to implementing the CIS upgrade, the Companies met with Commission staff in March 2017, informing staff that they planned to suspend disconnections and certain other collection activities until the upgrade was completed and billing processes were stable. Staff did not oppose the 2017 disconnection moratorium. While the moratorium was in place, the Companies maintained certain other collection efforts.

¶ 10        C. 2017 Rider UEA Reconciliation Proceeding and Commission Decision

¶ 11     On August 30, 2019, the Companies petitioned for review of their 2017 uncollectibles. The Attorney General did not intervene in that proceeding.

¶ 12     On April 29, 2021, the Commission issued its final order and approved the Companies' Rider UEA (for the 2017 calendar year). In its decision, it related that an evidentiary hearing was held and that the Companies presented testimony from Sonia Holler, a "project specialist 3" in regulatory affairs, and David Baron, director of credit and collections in strategy and operations. The Companies also presented their reconciliation statements and calculations. North Shore sought to recover $157,115 from customers, and Peoples Gas sought to recover $9,531,725. Commission

staff presented testimony from Dianna Trost, an accountant in the financial analysis division, and Joan Howard, a consumer policy analyst in the consumer services division.

¶ 13    As related in the Commission's order, Baron testified that, between April and *September 2017* (a longer time frame than what the Companies represented), the Companies limited their collection activities due to implementation of the CIS upgrade, including suspending late-payment assessments for 60 days after the April 2017 go-live date and suspending disconnection activity for 120 days after the go-live date. He also testified that the Companies resumed disconnection activity for nonpayment beginning in September 2017. Given the cessation of disconnection actions during the CIS upgrade and the proximity of the winter disconnection moratorium beginning in November, overall disconnection activity for nonpayment for 2017, per Baron, was significantly decreased from prior years' activity. He also stated that it is typical utility industry practice to suspend disconnection activity during a CIS modification or replacement.

¶ 14    The Commission further noted that Trost stated that the Companies provided exhibits that presented reconciliations for uncollectibles incurred during the 2017 calendar year, along with other data. She proposed no adjustments to the Companies' costs and recommended that the Commission accept the reconciliations. Howard testified that she had reviewed Baron's testimony concerning section 19-145(c) and "nothing had come to her attention that the Companies' actions" regarding the minimization of and collection of uncollectibles were imprudent or unreasonable. Thus, she had, per the Commission, "no recommended determinations for the Commission to make regarding adjustments or suggestions for prospective changes in current practices pursuant to" section 19-145.

¶ 15 The Commission noted that there were no contested issues between the parties for it to resolve, it determined that the Companies' Rider UEA reconciliation calculations for 2017 were accurate, and it approved them.

¶ 16 D. 2018 Rider UEA Reconciliation Proceeding

¶ 17 In August 2020, the Companies filed their annual reconciliation petitions, asking the Commission to approve their uncollectibles incurred during the 2018 calendar year. The Companies' records reflected that 2018 uncollectibles totaled about $40.4 million ($1.9 million for North Shore and $38.5 million for Peoples Gas). (On June 2, 2021, docket No. 20-0665, North Shore, and No. 20-0666, Peoples Gas, were consolidated.) The Companies offered testimony by Holler, who addressed how uncollectibles were calculated, and Baron. Trost and Howard testified for Commission staff, and Abigail Miner testified for the Attorney General.

¶ 18 The accuracy of the calculation of the reconciliation amounts and the Companies' reconciliation statements was not contested. The Attorney General, however, contested whether the Companies were entitled to recover the reconciliation amounts in full. He urged the Commission to disallow $468,120.11 of North Shore's requested write-off and $9,632,151.77 of Peoples Gas's requested write-off because the Companies have an ongoing obligation to pursue minimization and collection of uncollectibles and, per the Attorney General, they violated this requirement when they unreasonably and imprudently suspended components of their collection activities for four months to up to one year as part of the 2017 CIS upgrade.

¶ 19 In discovery responses, the Companies did *not* assert that they provided notice to the Attorney General in 2017 of their intention to discontinue disconnections and other collection activities during the CIS upgrade (and, again, the Attorney General did not intervene in that proceeding). They also responded that the "*main reason* for the increase [in uncollectible accounts

receivable from the beginning of 2017 until the end of 2018] is the Compan[ies] implemented a new customer system in April 2017 and as a result, disconnections and therefore write-offs were for the main part suspended *for a year* until the system was stabilized." (Emphases added.) In another discovery response, they stated that the count of residential customers in arrears at the beginning of 2018 was "not readily available." They also responded that arrears are not written off until an account is disconnected and that they could not "identify how much of the residential arrearage carried over from 2017 to 2018 were [*sic*] included in recovery in this docket."

¶ 20                                    1. *Abigail Miner*

¶ 21     Miner, a programs specialist in the Attorney General's public utilities bureau, has a bachelor's degree in political science and a master's degree in public policy. Her resume states that she mediates between constituents and both regulated and nonregulated public utilities to resolve complaints concerning billing processes, collection disputes, and safety concerns, etc. She is also the Attorney General's liaison to the commerce and economic opportunity department and advocates for low-income constituents, monitors energy policy developments, and represents the public utilities bureau at various meetings.

¶ 22     Miner addressed the Companies' CIS upgrade and testified that it began in April 2017. The Companies voluntarily suspended late payment fees for two months after the go-live date of the upgrade and voluntarily suspended disconnection activity for four months after the go-live date. (Thus, her recommendations were based on the Companies' representation that they suspended disconnection activities for four months in 2017, not one year.) When asked how the upgrade impacted credit and collections in 2017, Miner stated that any decrease in collections due to the suspension of disconnections and late-payment fees "is unknowable because it is impossible to

gauge how successful the Companies' collections would have been in 2017 absent the upgrade." Next, she addressed the impact of the upgrade on 2018 credit and collections:

"It is impossible to know with certainty how the suspension of late payment fees and disconnections in 2017 impacted the success of credit and collections practices in 2018. However, inferences can be made based on the information provided by the Companies. It is safe to assume that a significant portion of credit and collections activity in 2017 was deferred to 2018. For example, only 27 NS customers were disconnected in 2017 ***, while 1,006 NS customers were disconnected in 2018 ***. *** Similarly, only 1,645 PGL customers were disconnected in 2017 ***, while 17,353 customers were disconnected in 2018 ***."

¶ 23    Miner recommended that $468,120.11 of North Shore's $1,872,480.44 requested write-off be disallowed and that $9,632,151.77 of Peoples Gas's $38,528,607.08 requested write-off be disallowed because the requested write-offs represented about 16 months of credit and collections activity, not 12 months. She explained that this was so

"because significant credit and collections practices were suspended for 4 months of 2017 that were presumably deferred to 2018 and are now included in the 2018 write-off requests. I recommend disallowing 25% of each write-off request, commensurate with the 4 months of deferred credit and collections from 2017 deferred into 2018, which now represents 16 months of credit and collections activity ($4/16 = ¼ = 25\%$). ($1,872,480.44 x .25 = $468,120.11 and $38,528,607.08 x .25 = $9,632,151.77.)"

¶ 24    Miner explained that she believed that

"disallowance was proper because the Companies postponed significant credit and collections practices for 4 months in 2017, ballooning the Companies' write-offs in 2018.

To reach my calculation, I discounted the Companies' 2018 write-off requests by 25% because, by postponing disconnections for 4 months in 2017, the Companies essentially wrote-off an additional 4 months, resulting in 16 months of uncollectibles in their calendar year 2018 write-offs, not 12."

¶ 25    She further explained that "multiple factors suggest that the moratorium substantially increased the Companies' 2018 write-offs and that the Companies deferred a significant amount of their 2017 credit and collection activity to 2018." First, Miner pointed to the fact that the Companies disconnected "dramatically more residential customers in 2018 compared to 2017, suggesting that many accounts which would have otherwise been subject to collection activity in 2017 were not disconnected until 2018, thereby increasing uncollectibles in 2018." Second, she noted that "the Companies' postponement of disconnections and other collection activities corresponds with a large one-year increase in uncollectibles from 2017 to 2018. From 2017 to 2018, North Shore's write-offs increased from $1,186,311 to $1,872,480, an increase of nearly 58%. Meanwhile, People Gas' write-offs increased from $31,163,842 to $38,528,607, an increase of 24%."

¶ 26    Miner stated that her recommendation "mitigates the negative impact on ratepayers of foregone credit and collections activity in 2017 because of the CIS update and is more in the spirit of incrementalism." She testified that, although disconnections should be a last resort to recouping an arrearage, they "are a significant component of standard credit and collections practices that should not be unilaterally suspended. The Companies['] postponement of disconnections and other collections activities negatively impacts *all* ratepayers because it increases customer arrearages and the Companies' write-offs, the costs of which were ultimately borne by all ratepayers." (Emphasis in original.)

¶ 27 Finally, addressing whether her recommended adjustment should have been offered in the 2017 Rider UEA reconciliation proceeding, Miner opined that the 2018 proceeding was the proper one:

"The Companies ceased disconnections and other collections activities in 2017, thus artificially inflating the write-offs for 2018. In this proceeding, the Companies request that the Commission approve the inflated 2018 write-offs. The [Attorney General] had no opportunity before this proceeding to see the effect of the Companies' 2017 collections activity and to contest the validity of the Companies' 2018 uncollectibles. Thus, this is [the] appropriate forum to request that the Commission disallow 25% of the Companies' 2018 write-offs. Further, the Compan[ies'] response[s] to the [Attorney General] data requests shows that the Compan[ies] did not tell the [Attorney General], or any other consumer advocates, about [their] plan[s] to suspend disconnections and other collections activities in 2017."

¶ 28                                    2. *David Baron*

¶ 29 Baron opined that the Companies prudently and reasonably implemented minimization and collection of uncollectibles in 2018 consistently with section 19-145(c). He also opined that they acted prudently and reasonably in undertaking the activities set forth in that section.

¶ 30 Baron testified that Miner's and the Attorney General's position presented "a novel and unfair theory" that penalizes the Companies for their pro-consumer behavior in suspending disconnections for a period in 2017. He noted that no witness contested the accuracy of the Companies' 2018 reconciliation statements, Miner stated that the impact of 2017 events was "unknowable," and the Commission had never previously adopted the Attorney General's rationale. Baron argued that the Attorney General's position was an "after-the-fact 'gotcha' that

would penalize the Companies for millions of dollars, based on underlying behavior that was actually pro-consumer." He noted that no one challenged the Companies' 2017 disconnection moratorium, including the Attorney General.

¶ 31 Baron also noted that Miner does not have extensive experience with billing and collections processes and proceedings experience, does not have an accounting background, had not previously testified in any uncollectibles or billing processes cases, and had only twice testified in recent utility cases before the Commission. He further noted that she is not an accountant. Thus, he questioned the validity of her proposal, because the reconciliation proceeding involves an evaluation of the accuracy of the Companies' reconciliation accounting and her proposal concerns the accounting treatment of the companies' 2018 uncollectibles reconciliation.

¶ 32 Addressing the CIS upgrade, Baron testified that the Companies suspended disconnections and certain other collection activities for four months during the 2017 upgrade. They did so to eliminate the possibility of wrongful disconnections during that period and wanted time post-upgrade to monitor bills for accuracy before starting collections in 2017. Peer utilities, he noted, have taken similar approaches during comparable system upgrades. The temporary suspension of disconnections and other collection activities was reasonable and prudent under the circumstances existing at the time, served customers' best interests based on those circumstances, and was consistent with utility industry best practices then in use. Also, neither Commission staff nor any other party objected to the disconnection moratorium. Baron noted that the Companies met with Commission staff in March 2017 before the CIS upgrade went live and alerted staff that disconnections and certain other collection activities would be suspended until the upgrade was complete and billing processes were stable. Staff did not oppose the proposal.

¶ 33    Addressing the Companies' Rider UEA reconciliations for the 2017 calendar year, Baron noted that the Commission approved the Companies' reconciliations. "The disconnection moratorium related to the 2017 CIS upgrade was not a contested issue. In fact, neither the Attorney General nor any other consumer protection organization intervened in that case."

¶ 34    Addressing Miner's proposed 25% disallowance, Baron testified that the Attorney General's position was internally inconsistent in that, while the office is institutionally committed to achieving fewer customer disconnections, in this case, it seeks to significantly reduce the Companies' 2018 uncollectibles because they suspended disconnections for four months in 2017. "[T]he AG is seeking to penalize the Companies (i.e., by reducing their uncollectibles recovery) because the Companies did something that the AG generally and institutionally favors (i.e., suspending disconnections)."

¶ 35    Baron further testified that, even if some uncollectibles reduction for 2018 was reasonable, Miner's theory did not make sense, because she stated that the impact of the moratorium is unknowable, she failed to acknowledge or discuss that disconnections in a normal collections period are driven by a wide array of variables, and not all customer receivables are forever lost. Without even attempting to account for variables, Miner, in Baron's view, speculated about 2018 collectibles based on 2017 events. Her 25% proposed reduction, he asserted, was not consistent with generally accepted accounting principles (GAAP). Under GAAP standards, a write-off or write-down of outstanding receivables would not occur for a limited suspension of disconnections. Also, incrementalism is not the appropriate standard in an uncollectibles rider case. Even if it were, "the impact on customers in allowing [the Companies] full recovery of uncollectibles, rather than the 75% that [the] AG recommends, would be *de minimis*. However, the cumulative impact on [the Companies] is *very* significant." (Emphasis in original.)

¶ 36    Baron also expressed concern about the precedent Miner's disallowance recommendation would set. He noted that, from time to time, utilities suspend disconnections and other collection activities (including, for example, during the COVID-19 public health emergency) and that, if the Attorney General were to propose substantial reductions in uncollectibles recoveries in subsequent years, the Companies would have well-founded, serious concerns.

¶ 37    Baron stated that Commission staff had not expressed support for the Attorney General's position, and he characterized the position as a policy preference that did not challenge the accuracy of the Companies' reconciliation statements. The Attorney General, he also asserted, had not identified any case or other authority that supported its disallowance proposal.

¶ 38    Baron testified that there was no indication of wrongdoing by the Companies. He characterized the disconnection moratorium as a pro-consumer step and consistent with the pro-consumer steps for which the Attorney General regularly advocates. He noted that, in the 2017 Rider UEA case, Howard acknowledged the CIS upgrade in her direct testimony.

¶ 39                                3. *Additional Testimony*

¶ 40    Trost, a licensed certified public accountant in the accounting department of the financial analysis division of the Commission, stated that she reviewed the Companies' reconciliations. She did not propose any adjustments, stating that nothing had come to her attention to indicate that there were any errant costs recovered by the Companies during the reconciliation period.

¶ 41    Howard testified that her responsibilities include reviewing utility policies and practices, monitoring the Commission's customer complaint tracking system, developing consumer protection rules and practices, and developing rules and policies related to billing and collection practices of public utilities. The purpose of her testimony was to report the results of her review of the Companies' actions to pursue minimization and collection of uncollectibles in calendar year

2018 and to recommend any changes to current practices pursuant to section 19-145(c)'s requirements. She testified that she reviewed Baron's testimony regarding actions designed to comply with the section's requirements, and she had no recommendations to change those actions.

¶ 42                    E. Commission Decision—2018 Calendar Year

¶ 43    On May 18, 2023, the Commission issued its final order, imposing a 40% disallowance of the Companies' 2018 uncollectibles.[1] As relevant here, it noted that the issues before it were the reconciliation amounts (the accuracy of which were not disputed) and whether the Companies' credit and collection practices during the reporting year were prudent and reasonable. As to the latter, which is at issue on appeal, the Attorney General contested whether the Companies were entitled to recover the proposed amounts in full, asserting that they acted imprudently when they suspended certain activities for 4 to potentially 12 months in 2017 even though (as they later admitted) the suspension was the "main reason" that uncollectibles grew substantially and unreasonably between 2017 and 2018. The Commission noted that Commission staff testimony did not respond to the Attorney General's proposed disallowance.

¶ 44    Turning first to the Companies' criticism of Miner's expertise as an expert witness, the Commission noted that "she is not an accountant and need not be" and that the record demonstrated she "has experience addressing a variety of consumer issues." It found that Miner's resume reflected that she had the requisite background under Illinois Rule of Evidence 702 (eff. Jan. 1, 2011) to testify as a subject matter expert. It noted that Howard was also not an accountant but had

---

[1]In its decision, the Commission also addressed issues relating to the Companies' notices, customer service representative processes, and communications and the retention of scripts and call recordings. Those aspects of the decision are not at issue in this appeal.

similar experience addressing customer complaints and consumer issues and acting as a third party between consumers and utilities. Finally, the Commission noted that the Companies did not move to strike any of Miner's testimony and, thus, "their objection to it now is untimely."

¶ 45　Next, turning to address section 19-145(c) of the Act, the Commission found that the Companies acted unreasonably. It noted that the Companies admitted that, during the CIS upgrade, they did not collect late payment fees or disconnect customers. It also observed that it was not bound by precedent and could "approve any disallowance that reflects a failure to comply with the Act" and its rules. The Commission also noted that its determination was based on the "prudence and reasonableness of the Companies' actions to meet their statutory obligations to pursue minimization and collection of uncollectibles." The Commission noted that the standard was the level of care a reasonable person would be expected to exercise at the time decisions had to be made and not whether other utilities had made similar management decisions. However, it acknowledged that prior similar behavior by other utilities may be helpful in considering whether the Companies' actions were reasonable. "The information that the Companies had at the time they designed and implemented their upgrades is what is relevant in assessing the prudence and reasonableness of their decisions."

¶ 46　Next, the Commission addressed whether the 2018 reconciliation proceeding was the proper one in which to address any adjustment:

> "The Commission agrees with the AG that this reconciliation docket is the appropriate docket to raise this adjustment—here, the AG claims the Companies did not follow Section 19-145(c) because during this reconciliation period, they did not follow the six criteria to limit uncollectibles. The AG therefore proposes a disallowance. The

Commission agrees that there is no other docket where such an adjustment would be made."

¶ 47   The Commission addressed the Companies' argument that no consumer advocate objected at the 2017 reconciliation proceeding. It noted that the Companies admitted that no consumer advocate was informed. The Commission acknowledged that the Companies informed Commission staff, even though they were not required to, but it noted that the record was silent as to what was discussed between the Companies and staff. In any event, it continued, any discussions would not make the Companies' actions prudent and reasonable, as the Commission must, at a minimum, consider the section 19-145(c) criteria.

¶ 48   The Commission determined that the Companies did not act reasonably and prudently when they stopped collection activities and suspended disconnections in 2017 as a result of the CIS upgrade. It found that the Attorney General's four-month estimate was conservative, based on evidence that, in April 2017, the Companies implemented the new customer system and, as a result, "disconnections were suspended for a year." It further noted that, during oral argument, the Companies "again confirmed that the downtime for the CIS upgrade lasted from April 2017 until at least January 2018."[2]

> "The Commission disagrees with the Companies that the disconnection moratorium
> and suspension of *all* collection activities during the CIS upgrade were reasonable under
> the circumstances at the time. While the Companies represent that they chose to suspend
> disconnections and *certain other* collection activities during the 2017 CIS upgrade to

---

[2]Counsel for the Companies noted that the CIS upgrade began in April 2017 and the system was running again in January 2018.

eliminate the possibility of incorrectly or accidentally disconnecting customers during the upgrade, the Companies did not present evidence in this proceeding suggesting that the only choice they had was to either suspend disconnections entirely or improperly disconnect customers." (Emphases added.)

¶ 49    The Commission noted that the Companies have an ongoing obligation to comply with section 19-145(c). When deciding to implement the CIS upgrade, it found, the Companies should have been aware of their statutory obligations and "should have considered the potential consequences of suspension of *all* collection practices. With that understanding[,] they could have planned, prepared for, and implemented alternative collections activities during the CIS upgrade to minimize the increase in uncollectibles from 2017 to 2018." (Emphasis added.)

¶ 50    Next, addressing Miner's 25% disallowance recommendation, the Commission found that she provided the correct methodology "but underestimate[d] the CIS upgrade's impact to 2018's uncollectibles." Miner estimated that 2018's 12-month period actually reflected 16 months of credit and collections activity, it noted. The Commission found that the Companies "acknowledged that the CIS upgrade actually impacted uncollectibles for an *entire year* beginning in April 2017, not the planned 4 months." (Emphasis added.) Thus,

> "[a]ccounting for months under moratoria (excluding the month of December 2017, which is part of [the] annual mandatory winter disconnection moratorium), the CIS upgrade activation and stabilization period affected credit and collections activity over eight months (April through November 2017). This means that 2018's reconciliation period reflects 20 months of uncollectibles, rather than 16 months as suggested by the AG. Accordingly, the Commission approves a 40% disallowance (8 months / 20 months = 40%) to the Companies' requested 2018 uncollectibles reconciliation. Using the same formula that Ms.

Miner provides, the Commission approves a disallowance of $748,992 from North Shore's requested write-off and $15,411,442 from Peoples Gas' requested write-off."

¶ 51                                        F. Application for Rehearing

¶ 52    On June 20, 2023, the Companies filed an application for rehearing. 220 ILCS 5/10-113(a) (West 2022); 83 Ill. Adm. Code 200.880 (2000). As relevant here, the Companies sought rehearing on the following issues: the finding that their 2017 actions constituted unreasonable and imprudent behavior for purposes of the 2018 reconciliation proceeding and the 40% disallowance of requested uncollectibles write-offs. They argued that the Commission's order contradicted its findings as to the same actions by the Companies in 2017, contained legal and factual errors, disregarded the evidentiary record, and relied on a novel and highly speculative disallowance theory and calculation methodology presented by an unqualified witness to reach an unprecedented outcome. They sought to present in their application two categories of additional evidence: (1) a list of certain collection activities in which they engaged (and did not suspend) in 2017 (the Companies asserted that the Commission incorrectly found that they had suspended *all* collection activities during the 2017 disconnection moratorium and that this finding should be corrected on rehearing) and (2) data, presented in a table, relating to year-over-year trends between 2015 and 2022 in uncollectibles write-off amounts for them and other Illinois utilities. They asserted that, in its order, the Commission, *sua sponte*, criticized the Companies for not evaluating other options in 2017 and expressed skepticism about their alleged failure to consider potential consequences of suspension of collection activities. The Companies asserted that there was no aberrational spike in uncollectibles in 2018 (they alleged that 2018 uncollectibles write-off amounts were *below* the average for the eight-year period from 2015 to 2022); Baron testified that complex factors can affect uncollectibles rates and the Commission had no way of knowing if the temporary

moratorium simply shifted uncollectibles from one year into another or if it caused any growth in 2018 uncollectibles.

¶ 53 The administrative law judge (ALJ) recommended that the Commission deny the rehearing application on the bases that, generally, no new arguments were raised and the purported new data regarding uncollectibles had no bearing on whether the Companies' actions were improper, because the Commission's order was "not based on the assumption that there was a spike in uncollectibles in 2018." Further, the ALJ noted that, to the extent the Commission's decision was inconsistent with the 2017 order, the Commission is not bound by *res judicata* and "can adjudicate freely with each situation as it comes before it, regardless of how it may have dealt with a similar or even the same situation in a previous proceeding."

¶ 54 On June 29, 2023, the Commission denied the application. The Companies petition this court for review and reversal of the Commission's final order and its order on rehearing.

¶ 55                                    II. ANALYSIS

¶ 56 The Companies argue that the Commission's disallowance should be reversed. They contend that (1) the Commission's disallowance is arbitrary and capricious because it penalizes the Companies' 2017 actions that the Commission knew of and did not disapprove in prior proceedings and (2) the Commission cited no reasonable basis in the record for its 40% disallowance and there is none. For the following reasons, we reject their arguments.

¶ 57                              A. Standards of Review

¶ 58 Judicial review of a decision by the Commission is limited to four questions: "(1) whether the Commission acted within the scope of its authority, (2) whether the Commission made adequate findings in support of its decision, (3) whether the Commission's decision was supported by substantial evidence in the record, and (4) whether constitutional rights have been violated."

*Central Illinois Public Service Co. v. Illinois Commerce Comm'n*, 268 Ill. App. 3d 471, 476 (1994). "Substantial evidence" is simply "evidence that a reasonable mind might accept as adequate to support a conclusion." (Internal quotation marks omitted.) *Welch v. Hoeh*, 314 Ill. App. 3d 1027, 1035 (2000). It is not conclusive evidence, and it requires more than a mere scintilla but less than a preponderance of evidence. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 398 Ill. App. 3d 510, 514 (2009). "Substantial evidence can support multiple possible findings." *Citizens Utility Board v. Illinois Commerce Comm'n*, 2018 IL App (1st) 170527, ¶ 36. The Commission's findings are deemed to be *prima facie* true and correct, and the party challenging them has the burden of showing them to be against the manifest weight of the evidence. 220 ILCS 5/10-201(d) (West 2022); see *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008) ("In examining an administrative agency's factual findings, a reviewing court does not weigh the evidence or substitute its judgment for that of the agency. Instead, a reviewing court is limited to ascertaining whether such findings of fact are against the manifest weight of the evidence.").

¶ 59 Finally, if a party contends that the administrative agency erred in its ruling on the admissibility of evidence, we decide whether the ruling was an abuse of discretion. *Danigeles v. Illinois Department of Financial & Professional Regulation*, 2015 IL App (1st) 142622, ¶ 82. A ruling is an abuse of discretion where it is "arbitrary or capricious," and "no reasonable person would agree with" it. (Internal quotation marks omitted.) *Sonntag v. Stewart*, 2015 IL App (2d) 140445, ¶ 22.

¶ 60                               B. Public Utilities Proceedings

¶ 61 The Act creates the Commission, which is the administrative agency responsible for setting rates that public utilities may charge their customers. *Madigan*, 2015 IL 116005, ¶ 6; 220 ILCS

5/2-101 (West 2022). The statute provides that all rates and charges by public utilities, as well as all rules and regulations concerning those charges, must be "just and reasonable." 220 ILCS 5/9-101 (West 2022). In ratemaking-related proceedings, "the burden of proof to establish the justness and reasonableness of the proposed rates or other charges *** shall be upon the utility." *Id.* § 9-201(c).

¶ 62    The supreme court

"has long recognized that the Commission 'is not a judicial body, and its orders are not *res judicata* in later proceedings before it.' *Mississippi River Fuel Corp. v. Illinois Commerce Comm'n*, 1 Ill. 2d 509, 513 (1953). The Commission, as a regulatory body, has the 'power to deal freely with each situation as it comes before it, regardless of how it may have dealt with a similar or even the same situation in a previous proceeding.' [*Id.*]; see also *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111, 125 (1995) (holding the Commission's past precedent of allowing full recovery of statutorily imposed operating expenses 'is not controlling, because the Commission is a legislative and not a judicial body, and generally its decisions are not *res judicata* in later proceedings before it'); *United Cities Gas Co. v. Illinois Commerce Comm'n*, 163 Ill. 2d 1, 22-23 (1994) (rejecting argument that the Commission is bound by its prior orders under the doctrine of *res judicata*)." *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2016 IL 118129, ¶ 24.

¶ 63    Deference to the Commission is especially appropriate in matters of ratemaking because such matters are legislative in character and the legislature has entrusted the Commission, not the courts, to use its sound judgment and expertise in determining rates. *Madigan*, 2015 IL 116005, ¶ 23; *Cerro Copper Products v. Illinois Commerce Comm'n*, 83 Ill. 2d 364, 371 (1980); *City of*

*Chicago v. Illinois Commerce Comm'n*, 281 Ill. App. 3d 617, 622 (1996). Judges are not utility regulators. *Madigan*, 2015 IL 116005, ¶ 22. However, where the Commission departs from its usual rules of decision to reach an unexplained result in a single case, thus, depriving a party of equal treatment before it, its decision is entitled to less deference. *Abbott Laboratories, Inc. v. Illinois Commerce Comm'n*, 289 Ill. App. 3d 705, 715 (1997).

¶ 64     In a reconciliation proceeding under section 19-145(c), the Commission must (1) "verify that the utility collects no more and no less than its actual uncollectible amount" (accounting review) and (2) "review *** the prudence and reasonableness of the utility's actions to pursue minimization and collection of uncollectibles," including, at a minimum, the six statutory activities. 220 ILCS 5/19-145(c) (West 2022). In examining the prudence and reasonableness of actions, hindsight review is prohibited. *Illinois Power Co. v. Illinois Commerce Comm'n*, 339 Ill. App. 3d 425, 428 (2003).

¶ 65     The Act does not define prudence. *Illinois Power Co. v. Illinois Commerce Comm'n*, 382 Ill. App. 3d 195, 201 (2008). However,

> "Commerce Commission proceedings and our court have defined prudence as 'that standard of care which a reasonable person would be expected to exercise under the same circumstances encountered by utility management at the time decisions had to be made.' *Illinois Commerce Comm'n v. Commonwealth Edison Co.*, Ill. Com. Comm'n No. 84-0395, at 17 (October 7, 1987); *Illinois Power Co. v. Illinois Commerce Comm'n*, 339 Ill. App. 3d 425, 428 (2003). In determining whether a judgment was prudently made, only those facts available at the time judgment was exercised can be considered. *Illinois Power Co. v. Illinois Commerce Comm'n*, 245 Ill. App. 3d 367 (1993)." *Id.*

¶ 66                                C. 2017 Reconciliation Decision

¶ 67    The Companies argue that, in its order concerning the 2017 reconciliation proceeding, the Commission took no issue with the 2017 disconnection moratorium but then arbitrarily and capriciously changed its mind one year later in the 2018 reconciliation proceeding that is the subject of this appeal. They suggest that, by the time of the 2018 proceeding, the Commission had already determined the reasonableness and prudence of the 2017 disconnection moratorium: it approved the Companies' proposed reconciliation with no disallowance. The Companies argue that this *necessarily* entailed a finding that their efforts to minimize uncollectibles in 2017 were reasonable and prudent. Now, however, the Commission (with several new appointments to the agency and financial data showing the Companies' uncollectibles in 2018 were higher than in 2017) seeks to claw back its 2017 order and penalize the Companies for the very same actions it previously approved. This reversal, the Companies maintain, with no change in the facts and no adequate explanation, is patently arbitrary and capricious and warrants reversal.

¶ 68    The Companies contend that the Commission improperly engaged in hindsight review to reevaluate their conduct. Instead of focusing on whether the Companies' 2018 collection efforts were prudent—the only relevant inquiry under section 19-145(c)—the Commission went back in time to reassess the Companies' 2017 actions and then imposed a 2018 disallowance for them. The Companies assert that, whether framed as a second bite at the apple (2017 conduct was not sufficiently contested in 2017) or as based on better information (knowledge of the effects of the 2017 conduct), the Commission and the Attorney General cannot escape the conclusion that the entire 2018 disallowance rests on previously approved conduct from 2017. They note that they explained their upgrade and the moratorium in the 2017 reconciliation proceeding, the Commission and staff addressed the moratorium, and any party could have intervened to contest it. They also note that staff expressed no concern with the 2017 disconnection moratorium or any

potential impacts on uncollectibles. In the Companies' view, there is "no doubt" that the approved actions included the 2017 disconnection moratorium. In the 2017 proceeding, the Commission allowed full recovery with no disallowances. The Companies further argue that, to the extent there was *new* information in the 2018 proceeding, the Commission cannot engage in hindsight review. The Commission, it contends, is entitled to less deference when it drastically departs from past practice. Any departure from past practice must not be arbitrary, but must come with a plausible explanation supported by substantial evidence. Otherwise, the Commission is entitled to less deference or none at all.

¶ 69 The Commission responds that, in the 2017 reconciliation proceeding, it did not find that the Companies' suspension of disconnection activities was reasonable and prudent. In that proceeding, it notes, the Companies presented evidence concerning the prudence and reasonableness of the uncollectible write-offs they incurred in 2017. While the Companies "cursorily" described that they suspended disconnection activities, the Commission's analysis and conclusion section, it notes, contains *no* discussion or finding as to the reasonableness and prudence of the Companies' suspension of disconnection activities. Further, the Commission argues, the fact that the Commission did not object to the Companies' description of their suspension of disconnection activities does not constitute a finding that those activities were reasonable and prudent. Thus, any findings in the 2018 proceeding, it asserts, do not conflict with the 2017 reconciliation order. In any event, the Commission continues, even if the 2017 order could be construed as finding the Companies' suspension of disconnection activities reasonable as to 2017 uncollectibles, that finding would not render the Commission's findings in this proceeding arbitrary and capricious, because Commission orders are not *res judicata* in later proceedings before it. The facts and evidence in this proceeding are different, it contends, from those in the

2017 proceeding. Here, the Commission considered the Companies' request to recover uncollectible write-offs incurred in 2018, not 2017. The evidence in this proceeding showed, it argues, that the disconnection suspension in 2017 increased uncollectibles and deferred disconnections and therefore write-offs in 2018. It found that the increased uncollectibles and deferral of disconnections to 2018 were a direct result of their unreasonable and imprudent halt of disconnection activities in 2017. Prior to this proceeding, the Commission argues, no opportunity existed to see the effect the Companies' cessation of disconnection activities would have on 2018 uncollectibles and for a party to contest the validity of the Companies' inflated 2018 uncollectible write-offs.

¶ 70    The Attorney General adds that, during the 2017 proceeding, which addressed only 2017 uncollectibles, information about the 2018 uncollectibles was not before the Commission, so neither the Commission nor the Attorney General were aware that those 2018 uncollectibles were inflated. Further, in the 2017 proceeding, the Companies represented that they suspended disconnection activities for only four months, whereas, in this proceeding, there was evidence that the term was one year. The Attorney General further notes that no issue was contested in the 2017 proceeding, so the Commission did not consider the argument that suspending disconnections and related collection activities was unreasonable and would inflate uncollectibles. He urges that the Commission is empowered to examine the record in the case before it. Accepting the Companies' argument, he argues, would mean a utility can disregard section 19-145(c)'s requirements as long as it pushes inflated write-offs into the following year (as arrears are not written off until disconnection). Finally, the Attorney General also contends that the Companies did not inform his office before suspending disconnections.

¶ 71    We hold that the scope of the Commission's findings in the 2017 proceeding was more limited than the Companies represent. In its decision, the Commission noted that there were no contested issues. It related that Baron had testified about the Companies' efforts to minimize and collect uncollectibles, including serving disconnection notices. He also testified that, between April and September 2017, the Companies limited their disconnection activities due to the CIS upgrade. Overall, he noted, disconnection activity for nonpayment was "significantly decreased" from the prior year. The Commission also noted that its staff took no issue with the reconciliation statements and that Howard had testified that "nothing had come to her attention that the Companies' actions [concerning section 19-145(c)'s requirement to pursue minimization and collection of uncollectibles through the six activities therein] were imprudent or unreasonable" and, thus, she had no recommended adjustments for changes in current practices pursuant to the statute. The Commission found that, as there were no contested issues for it to resolve, the Companies' reconciliations were accurate, and it approved them.

¶ 72    We note that the subject of the 2017 disconnection moratorium's effect on uncollectibles was not addressed during this proceeding, nor, again, did the Commission make any findings concerning the reasonableness and prudence of the moratorium. Baron noted that disconnection activity was significantly decreased from the prior year, but any effect on uncollectibles (which would not yet have been ascertainable) does not appear to have been addressed by the witnesses and the Commission made no findings relating to the issue. Further, during discovery, the Companies were asked whether they provided to the Commission, Commission staff, the Citizens Utility Board, the Attorney General, or other entities notice about their intention to discontinue disconnections and other collection activities during the CIS upgrade. They responded that they provided verbal notice of the CIS upgrade and the 2017 disconnection moratorium to Commission

staff (specifically, Howard) on March 22, 2017 (plus follow-up discussions with staff in March 2019), and staff did not object to the discontinuation of disconnections and other activities during the upgrade or indicate that the discontinuation during the upgrade "should or would have any impact on [their] recovery or reconciliation of uncollectibles for calendar year 2018." The Companies did *not* state that they provided notice to the Attorney General or any stakeholder. And the Attorney General did not intervene in the 2017 proceeding and contends here that his office was not notified of the 2017 disconnection moratorium. Thus, there was no opportunity provided to the Attorney General to challenge the Companies' actions. The Companies' contention that any party could have intervened to contest their actions in the 2017 proceeding is, therefore, not well taken.

¶ 73    As the Commission notes, the 2018 proceeding considered the Companies' request to recover uncollectibles incurred in 2018, not 2017. That is, the focus of the 2018 proceeding was the increased uncollectibles and deferral of disconnections to 2018. The 2017 proceeding is relevant because the increases in 2018 resulted (we discuss causation more fully below) from the 2017 disconnection moratorium, an issue that was not addressed in the 2017 proceeding. Thus, the Commission, contrary to the Companies' assertion, did not declare the very same underlying conduct prudent with respect to 2017 and imprudent with respect to 2018. Further, the Commission did not engage in hindsight review. It found that a disallowance could have been made only in the 2018 proceeding. Indeed, this finding was reasonable, as the 2018 uncollectibles were the ones impacted by the actions taken in 2017. No disallowance *could* have been calculated prior to the 2018 proceeding. The Companies experienced an extraordinary increase in uncollectibles, as presented in the 2018 proceeding, and the Commission assessed evidence that reasonably explained the cause of the increase, which necessarily included the Companies' 2017 actions.

¶ 74                    D. Unreasonableness and Imprudence

¶ 75    Next, the Companies argue that the Commission erred in finding that they did not act prudently and reasonably in pursuing minimization and collection of uncollectibles. The Companies argue that they actively pursued robust minimization and collection activities throughout the 2017 disconnection moratorium, specifically citing four of the six activities outlined in section 19-145(c) of the Act (with the remaining two activities related to disconnections). They maintain that the evidence they offered on rehearing (*i.e.*, that they engaged in certain collection activities), which should have been accepted, substantiated this. They also argue that their continuation of most collection efforts during the moratorium shows that their collection activities were reasonable and prudent.

¶ 76    If a gas utility elects to establish an automatic adjustment clause tariff, it must "pursue minimization of and collection of uncollectibles through the following activities" set forth in the Act: (1) identify customers with late payments; (2) contact the customers in an effort to obtain payment; (3) provide delinquent customers with information about possible options, including payment plans and assistance programs; (4) serve disconnection notices; (5) implement disconnections based on the level of uncollectibles; and (6) pursue collection activities based on the level of uncollectibles. 220 ILCS 5/19-145(c) (West 2022).

¶ 77    We agree with the Attorney General and the Commission that the evidence supported the Commission's finding that the Companies did not reasonably and prudently minimize uncollectibles as required by section 19-145(c). It was undisputed that they stopped at least two collection activities that the statute requires: serving disconnection notices and disconnecting customers with unpaid balances. *Id.* The Companies did not present evidence that compliance was impossible or impracticable. Nor did they offer evidence that they had to either suspend

disconnections entirely or improperly disconnect customers during the CIS upgrade. As the Attorney General contends, the Companies could not explain why they chose to install the new CIS in April 2017 rather than during the winter moratorium when they would not have disconnected customers anyway. Nor did they offer testimony that stopping disconnections was the only way to avoid wrongfully disconnecting customers. On this point, the Commission notes that the Companies did not institute a billing moratorium or stop collecting payments from customers to ensure that they encountered no billing errors or collection errors due to the upgrade. The Companies, as the Attorney General notes, pointed to no utility in Illinois (where utilities can recover their uncollectibles from ratepayers) that had unilaterally stopped disconnections because of an internal decision to implement a new system. Accordingly, we hold that the Companies' cessation of two statutorily required activities supported the Commission's finding that the Companies did not reasonably and prudently pursue minimization of uncollectibles.

¶ 78            1. *Whether the Companies Suspended* All *Collections Efforts*

¶ 79    The Companies further argue as to the imprudence finding that the Commission erroneously determined that the Companies suspended *all* collection efforts during the 2017 disconnection moratorium. The Commission, they contend, misunderstood the scope of the moratorium. They point to the following language in the Commission's decision: (1) "The question concerning whether the AG's proposed disallowance should be approved is if the Companies acted reasonably and prudently when they *stopped collection activities* and suspended disconnections in 2017 as a result of the CIS upgrade"; (2) "The Commission disagrees with the Companies that the disconnection moratorium and suspension of *all* collection activities during the CIS upgrade were reasonable under the circumstances at the time."; and (3) "the Companies *** should have considered the potential consequences of suspension of *all* collection practices."

(Emphases added.) The Companies argue that there is no reasonable basis in the record for these statements, noting that no party had argued that the Companies had suspended *all* collection efforts for several months of 2017 but instead argued only that they had suspended customer disconnections and accompanying disconnection notices. The Companies further note that they requested rehearing, submitting evidence of all their collection efforts that continued throughout the moratorium. The Commission, they contend, ignored this evidence and stood by its final decision when it denied rehearing. It could have corrected the issue on rehearing, they argue, but it opted to leave its order "unclear" on this critical point.

¶ 80    The Attorney General responds that the Companies mischaracterize the Commission's order. He contends that the Companies picked two instances where the Commission referenced "all" collection activities. However, the Attorney General maintains, when read as a whole, the Commission's determination was based on its findings that the Companies had suspended collection activities related to disconnections. He notes that the Commission repeatedly noted that the Companies stopped collection activities related to disconnections: "suspended disconnection activity," "suspended key collection activities," "suspension of certain collection and disconnection activities," "unilaterally suspended disconnection activities," "disconnections and some collection activities," "CIS upgrade and related suspension of collection activity," and "chose to suspend disconnections and certain other collection activities." Similarly, the Commission argues in its brief that it fully understood the scope of the 2017 disconnection moratorium and that its isolated references to "all" collection activities or practices must be read in context and in relation to the parties' aligned positions that the Companies halted disconnections and certain (but not all) other collection activities during the CIS upgrade.

¶ 81 We hold that the Commission did not base its imprudence finding on a false factual premise. The two references to "all" collection activities, when read in light of the repeated instances where it correctly references "certain," "some," "key," etc. activities, reflects that the two "all" references were not meant to be literally read. Overall, there is no indication in the Commission's decision that the Commission misunderstood the nature of the Companies' activities during the 2017 disconnection moratorium. Accordingly, the Companies' argument is unavailing.

¶ 82           2. *Rehearing Evidence Related to Collection Activities*

¶ 83 Next, also related to the imprudence finding, the Companies reference certain proposed additional evidence they presented for the first time in their application for rehearing before the Commission, specifically citing evidence detailing their collection efforts that continued throughout the 2017 disconnection moratorium.[3] They argue that this evidence was properly submitted on rehearing and that this Court should consider it. They note that the evidence showed that they did not stop "all" collection activities in 2017, as the Commission, in their view, found in its order. This "new" evidence, they assert, was presented to rebut the Commission's erroneous finding that the Companies stopped collection activities. They maintain that they appropriately requested rehearing and submitted extensive evidence detailing all the collection efforts that continued through the moratorium. The Companies also note that they clearly stated that they were

---

[3]The collection data in their application for rehearing consisted of a listing of their 2017 collection activities, which included identifying and contacting customers with late payments, call center activities, setting up customer payment arrangements, engaging with collection agencies, screening applications for historical debts, and investigating gas theft/meter tampering.

providing the new evidence in response to the Commission's inaccurate finding concerning the discontinuation of uncollectible activities. They assert that we should consider their evidence and correct the Commission's error.

¶ 84     We hold that, even considering the rehearing evidence, the Companies' argument fails for the reasons stated above. In the rehearing application, the Companies' listed activities do *not* include serving disconnection notices or disconnecting customers with unpaid balances. Thus, the Companies have *never* asserted that they engaged in these two activities during the disconnection moratorium. As we determined, the Commission did not err in determining that the Companies did not perform all the activities required in section 19-145(c).

¶ 85                             E. Disallowance

¶ 86     The Companies next argue that the Commission's 40% disallowance was not supported by substantial evidence, or any evidence at all. The Commission, they assert, had never previously adopted the rationale presented here for its proposal of a substantial disallowance of their uncollectible write-off amount. This departure, coupled with the absence of substantial evidence in the record, the Companies assert, means this that court owes the Commission no deference.

¶ 87     The Companies maintain that the disallowance lacks evidentiary support because it is not supported by any causal methodology, the Commission *sua sponte* increased the already arbitrary disallowance amount requested by the Attorney General, and the Commission relied on the testimony of an unqualified witness—Miner, the Attorney General's witness—in determining the disallowance. There was no basis to find, they assert, that the 2017 disconnection moratorium somehow *caused* the 2018 uncollectibles to increase. The foundation and sole basis of that finding was the methodology put forward by Miner, but it failed, they argue, to actually show that the moratorium caused the increase: the Commission did not identify any record evidence establishing

that the 2017 disconnection moratorium shifted any uncollectibles into 2018 and Miner simply presumed this; the Commission did not calculate a baseline for what 2018 uncollectibles should have been absent the presumed shift (and it had the rehearing application data for 2015 to 2022); and the Commission did not explain why, if four or eight months of uncollectibles would have been recovered under the 2017 rider in any event, deferring them for collection under the 2018 rider was unreasonable or imprudent. On this last point, they contend that, even if Miner was correct that some moratorium-induced deferral occurred, this means only that 2018 amounts were *higher* because 2017 amounts were *lower*. A mere shift in timing, the Companies argue, does not demonstrate unreasonableness or imprudence. Nothing in the record, they contend, shows that the 2017 disconnection moratorium *created* additional uncollectibles, as opposed to merely *shifting* uncollectibles that would have occurred anyway.

¶ 88    The Companies also maintain that the Attorney General's proposed disallowance, which was adopted and expanded by the Commission, relied on causal inferences that have no methodological or factual basis. Miner admitted, the Companies argue, that she was merely speculating about the causal relationship between the 2017 disconnection moratorium and 2018 uncollectibles, since any actual cause and effect was unknowable. She (and the Commission and the Attorney General) failed to calculate a baseline for what 2018 uncollectibles would have been without the 2017 disconnection moratorium. In the Companies' view, at best, the Commission relied on methodology that confused correlation with causation, and it did not explain why it chose to adopt the Attorney General's methodology or how it is correct.

¶ 89    They also note that uncollectible accounts receivable mature into write-offs over time, and then only under certain conditions. Therefore, one cannot draw a straight line from some increase in uncollectible accounts receivable in 2018 to 100% of the increase in 2018 write-offs, only some

of which would relate to the accounts receivable that were the focus of the discovery request. Thus, the Commission erred in finding that the Companies' "admission" regarding 2018 accounts receivable somehow supplied the missing link to write-offs in 2018. The Companies contend that 2018 actual uncollectibles exceeded 2017 actuals by only 24.9%, which demonstrates that eight months of 2017 write-offs did not shift into 2018. Even if the 2017 baseline is correct, they suggest, the final disallowance exceeded the entire actual increase in uncollectible write-offs from 2017 to 2018 by $5 million. The Commission's findings, they argue, were erroneous and, at a minimum, this court should reduce the disallowance to the amount suggested by the Attorney General.

¶ 90    The Attorney General responds that the Commission's decision to disallow about $16 million of the Companies' requested uncollectibles was supported by substantial evidence. It reasonably credited, he contends, Miner's testimony that the Companies' decision to stop disconnection activities meant that customer arrearages were allowed to balloon (*i.e.*, inflated, not merely shifted) during that period. And the inflated balances were not written off until the Companies resumed disconnections in 2018. Thus, 2018 uncollectibles included balances that had accumulated in 2017. The Attorney General also notes that the Commission credited the Companies' admission that they suspended collection actions for one year (as opposed to four months) from April 2017 (beginning of CIS implementation) through November 2017 (beginning of winter disconnection moratorium). It then adopted Miner's proposed method of estimating a disallowance and adjusted her calculations to incorporate its finding that disconnections and related activities were suspended (and therefore uncollectibles were allowed to balloon) for eight months, from April through November 2017. Thus, the Attorney General notes, the Commission determined that the amount of uncollectibles requested represented 20 months of uncollectibles: those from the full year of 2018 plus the 8 months of 2017 while disconnection activities were

suspended. The Commission attributed 40% of the amount (representing 8 of the 20 months) to the unreasonable suspension and disallowed 40% of the Companies' request (*i.e.*, $16.2 million). The Attorney General also argues that the Commission was not required to explicitly identify a baseline of what 2018 uncollectibles would have been if the Companies had acted prudently and reasonably. He maintains that the Commission implicitly established a baseline: by estimating that 2018 uncollectibles were inflated by 40% because the Companies had suspended required collection activities, it implicitly determined that the remaining 60% of uncollectibles were the product of reasonable and prudent collection efforts.

¶ 91    The Attorney General also argues that the historical net write-off data that the Companies sought to introduce in their rehearing application does not compel reversal, because it should have been introduced earlier in the proceeding (he had presented evidence that stopping disconnection activities inflates customer balances, and he offered his approximation and compared the write-offs to the prior year). He further contends that the data would show only that the evidence could have reasonably supported another conclusion about what 2018 uncollectibles would have been, but it was not clearly evident that historical net write-offs should have been used to approximate a baseline; the Companies did not explain how the data could be used to calculate what 2018 uncollectibles would have been if the Companies had not stopped disconnection activities.[4]

¶ 92    The Commission, in turn, responds that the disallowance was reasonable and supported by the evidence. It contends that it determined an appropriate adjustment to address the Companies'

---

[4]The Attorney General further notes that the data includes three years during the COVID-19 pandemic, a period during which disconnections were suspended but for different reasons than those presented here.

violation of section 19-145(c)'s requirement to pursue minimization and collection of uncollectibles. In disallowing recovery of 40% of the Companies' inflated 2018 uncollectibles, the Commission balanced ratepayer and utility interests. The evidence showed, it contends, that the Companies' suspension of disconnections in 2017 increased uncollectibles and postponed "disconnections and therefore write-offs" into 2018. The Companies, it notes, did not present an alternative methodology to calculate a disallowance, as their position was that no disallowance was warranted. Thus, the opposite conclusion the Companies must demonstrate is that the manifest weight of the evidence compels the conclusion that no disallowance was warranted. They cannot, the Commission argues, make this showing.

¶ 93    The Commission further points to the Companies' factual admission (specifically, their discovery response) that the "main reason for the increase [in uncollectible accounts receivable from the beginning of 2017 until the end of 2018] is the Company implemented a new customer system in April 2017 and as a result, disconnections and therefore write-offs were for the main part suspended for a year until the system was stabilized." The foregoing, the Commission argues, is sufficient to show that the voluntary cessation of disconnection activities caused the extraordinary increase in uncollectible write-offs from 2017 to 2018. The Commission also points to additional evidence, including Miner's testimony that the suspension of key collection activities substantially increased 2018 write-offs and that the Companies deferred a significant amount of their 2017 credit and collection activity to 2018. It further notes her testimony concerning the number of disconnections in 2018 as compared to 2017 and her testimony that actual uncollectible write-offs increased during the period.

¶ 94    We hold that the Commission did not err in determining that a 40% disallowance was warranted. Miner, whose testimony the Commission reasonably credited, testified that the CIS

upgrade's impact on any decrease in collections was "unknowable because it is impossible to gauge how successful the Companies' collections would have been in 2017 absent the upgrade" and that

> "[i]t is impossible to know with certainty how the suspension of late payment fees and disconnections in 2017 impacted the success of credit and collections practices in 2018. However, inferences can be made based on the information provided by the Companies. It is safe to assume that a significant portion of credit and collections activity in 2017 was deferred to 2018. For example, only 27 NS customers were disconnected in 2017 ***, while 1,006 NS customers were disconnected in 2018 ***. *** Similarly, only 1,645 PGL customers were disconnected in 2017 ***, while 17,353 customers were disconnected in 2018 ***."

¶ 95 Thus, contrary to the Companies' argument that Miner's recommendations were speculative because she stated that the impact on 2018 collections was impossible to know with certainty, she further specified that, *notwithstanding this*, inferences *could* be made from the Companies' data. She based her recommendations on the Companies' representation that they suspended disconnection activities for four months in 2017 (not one year, which the Commission later credited) and came to the foregoing calculations. Miner's methodology, the Commission reasonably found, supported a finding that the Companies' imprudent and unreasonable actions warranted a disallowance (see 220 ILCS 5/19-145(c) (West 2022) ("The Commission shall determine any required adjustments ***.")), though she underestimated that 2018's reconciliation period reflected 16 months of activity (*i.e.*, 12 months representing 2018 plus the 4-month 2017 disconnection moratorium) instead of 20 months, as the Commission determined (*i.e.*, 12 months representing the 2018 reconciliation period plus 8 months representing the 2017 disconnection

moratorium and not including the winter disconnection moratorium). Noting counsel's response at oral argument at the administrative hearing, the Commission credited counsel's acknowledgement that the upgrade impacted uncollectibles for about one year; it utilized April through November (*i.e.*, eight months) and excluded the months representing the statutorily prescribed winter disconnection moratorium. (We also note that, in discovery responses, the Companies stated that "write-offs were for the main part suspended *for a year* until the [CIS] was stabilized." (Emphasis added.)) Miner's calculations reasonably incorporated the months of the 2017 disconnection moratorium, which she opined impacted 2018 uncollectibles. She utilized four months in her calculations, but the Commission utilized eight months in its calculations (*i.e.*, 12 months minus 4 months representing the winter disconnection moratorium) based on its reasonably crediting the Companies' representation that the 2017 disconnection moratorium was in place for about one year. Thus, the 2018 uncollectibles represented 20 months and would be reduced by 40% (*i.e.*, 8 months / 20 months = 40%).

¶ 96 The Companies, we note, were asked during discovery to identify the amount in residential customer account arrearage carried over from 2017 to 2018 deemed for recovery in the 2018 reconciliation proceeding, and they replied that they could not identify this amount and that arrears are not written off until an account is disconnected. They did not present their own methodology to calculate a disallowance and maintained that no disallowance was warranted. In light of the reasonableness of Miner's methodology and the absence of any contrary methodology presented by the Companies, the Commission's adoption of Miner's methodology (with the adjustment incorporating its findings concerning the duration of the 2017 disconnection moratorium) was not against the manifest weight of the evidence.

¶ 97    Critically, in a discovery response, the Companies stated that the "*main reason* for the increase [in uncollectible accounts receivable from the beginning of 2017 until the end of 2018] is the Company implemented a new customer system in April 2017 and as a result, disconnections and therefore write-offs were for the main part suspended *for a year* until the system was stabilized." (Emphasis added.) This reflects that they believed that the 2017 disconnection moratorium *caused* the increase in uncollectibles in 2018. It further undercuts their argument that Miner's testimony was speculative on this issue. Miner testified that the postponement of disconnections and other collection activities "increase[d] customer arrearages and the Companies' write-offs, the costs of which are ultimately borne by all ratepayers." She also opined that multiple factors suggested that the 2017 disconnection moratorium *substantially* increased 2018 write-offs, including: (1) the dramatic increase in disconnections from 2017 to 2018 (North Shore: 27 disconnections to 1006 disconnections (*i.e.*, over 37 times as many disconnections); Peoples Gas: 1645 disconnections to 17,353 disconnections (*i.e.*, over 10 times as many disconnections)) and (2) the correspondence of the postponement of disconnections and other activities with a large one-year increase in uncollectibles (58% for North Shore and 24% for Peoples Gas). The foregoing reasonably reflects that the 2017 disconnection moratorium did not merely shift balances that would have been written off in 2017 (and allegedly recovered in the 2017 reconciliation proceeding) into 2018. Miner testified that, when customers do not receive disconnection notices, their arrearages increase. Disconnection notices can prompt customers to make payments. In this respect, the Companies' position that the 2017 disconnection moratorium was a pro-consumer measure is not well taken, because the failure to urge payment of outstanding bills allows balances to balloon, thus, negatively impacting ratepayers. The Commission's finding was reasonable and consistent with the position the Companies maintained in earlier proceedings.

See *North Shore Gas Company*, Ill. Comm. Comm'n Nos. 18-1464 & 18-1465, at 14 (Order-Final Dec. 16, 2020) (Companies asserted that "[w]ithout disconnection activity, arrears for certain customers could continue to grow unabated").

¶ 98     We reject the Companies' argument that the Commission's decision was speculative because it should have calculated a baseline of what uncollectibles would have been in 2018 if the 2017 disconnection moratorium had not occurred. The Commission's finding that uncollectibles were inflated by 40% necessarily determined that the remaining 60% of the uncollectibles were prudent and reasonable.

¶ 99                 1. *Rehearing Evidence Concerning Historical Write-Offs*

¶ 100   The Companies further argue that the Commission should have accepted and considered historical write-off data for the years 2015 through 2022[5] that they presented in their rehearing application. They maintain that there was no reason for them to introduce this trend evidence earlier (*i.e.*, prior to rehearing) because, until the Commission's final order, no one had suggested what the Commission determined in that order. In its final order, they note, the Commission, for the first time, criticized the Companies for not evaluating other options in 2017 and expressed skepticism about their alleged failure to consider the potential consequences of suspension of "all" collection practices, based on its  mistaken belief that (1) there was an abnormal spike in 2018 uncollectibles, (2) the spike was caused by the 2017 disconnection moratorium, (3) and the

---

[5]The historical write-off data consisted of a table included in their application for rehearing that showed historical net write-offs for the Companies and several Illinois gas and electric utilities for the prior years 2015 through 2022, along with an average over the period for each utility.

Companies should have anticipated that spike in 2017. They also argue that the Commission should have used a baseline based on the historical data.

¶ 101   We reject the Companies' argument. As the Attorney General notes, at best, the historical data would have reasonably supported another possible conclusion about what 2018 uncollectibles would have been, but it was not clearly evident that the historical write-offs should have been used to approximate a baseline. See *Apple Canyon Lake Property Owners' Ass'n v. Illinois Commerce Comm'n*, 2013 IL App (3d) 100832, ¶¶ 69-70 (upholding Commission's adoption of one estimation method over another). Further, there was no evidence presented concerning the reasonableness and prudence of the Companies' actions during those years, which included years during the COVID-19 pandemic when disconnections were suspended for different reasons and included years for which there has not yet been a reconciliation proceeding. The Companies did not explain how the historical data could have been used to calculate any baseline.

¶ 102                            2. *Miner's Testimony*

¶ 103   The Companies argue that Miner's testimony as an expert witness was inadmissible and that she was unqualified to provide accounting testimony. They contend that she was unqualified to testify as to accounting practices or treatment because she is not a licensed accountant, nor does she possess relevant accounting experience. The Companies assert that her testimony did not aid the Commission in its findings because it was inaccurate and speculative.

¶ 104   Specifically, the Companies assert that the disallowance relied on Miner's proposed accounting calculations despite her not being an accountant and lacking any training or professional experience in accounting matters. This undermines, they contend, the validity, reliability, and evidentiary value of the Attorney General's accounting treatment, which the Commission adopted. Miner, they urge, lacks the qualifications to conduct an accounting review,

her testimony was inaccurate and rooted in speculation, and, even if she was qualified as an expert, her testimony was speculative because it did not apply any element of a causal methodology, including the calculation of any baseline uncollectibles for 2018.

¶ 105   The Commission responds that the Companies' challenge as to the admissibility of Miner's testimony is forfeited because at the evidentiary hearing they failed to timely object to Miner's qualifications and consented to admission of her expert testimony. Specifically, the Commission notes that the Companies' counsel did not object to the admission of Miner's written testimony. (To this, the Companies respond that they raised the issue in their rebuttal testimony, surrebuttal testimony, and briefing and that the Commission acknowledged it in its decision. They also raised it in their rehearing application. They contend that the "mere" fact that counsel did not object to the admission of Miner's written testimony into the record as exhibits changes none of this.) Regardless, the Commission further argues that the Companies erroneously represent Miner's testimony as performing an accounting review and opining as to accounting matters. It notes that the Attorney General did not contest the accuracy of the Companies' reconciliation statements and did not sponsor a witness to conduct an accounting review. The Commission also argues that Miner's testimony was not speculative but was based on the evidence and reasonable inferences therefrom. The Companies' admission that the CIS upgrade caused the substantial increase in uncollectible write-offs from 2017 to 2018 validated her inferences, it further contends.

¶ 106   "The credibility of expert witnesses and the weight to be given their testimony are matters for the Commission as the finder of fact." *Id.* ¶ 70. "Decisions of the Commission are entitled to great deference because they arise out of the deliberations of members who are much better qualified to interpret evidence supplied by specialists and technicians." *Lefton Iron & Metal Co. v. Illinois Commerce Comm'n*, 174 Ill. App. 3d 1049, 1060 (1988).

¶ 107   A witness is "permitted to testify as an expert if his experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion." *People v. Enis*, 139 Ill. 2d 264, 288 (1990). This standard has been codified in Illinois Rule of Evidence 702 (eff. Jan. 1, 2011), which provides that, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." The Rules of Evidence apply to Commission proceedings. 83 Ill. Adm. Code 200.610(b) (2000). There are no "explicit requirements as to the level or extent of experience, education, scientific study, or training that is required to qualify a witness to offer expert testimony on a subject." *People v. Pingelton*, 2022 IL 127680, ¶ 56. "In determining whether such testimony is proper, the relevant question is whether the witness has knowledge and experience beyond the average citizen that would assist the jury in evaluating the evidence." *Id.*

¶ 108   We reject the Companies' arguments concerning Miner's qualifications and testimony. First, Miner's background provided a sufficient basis from which to find that she was qualified to address collections issues. She is a programs specialist in the Attorney General's public utilities bureau, has degrees in political science and public policy, and mediates to resolve complaints concerning billing processes, collection disputes, safety concerns, etc. She is also the Attorney General's liaison to the commerce and economic opportunity department, advocates for low-income constituents, monitors energy policy developments, and represents the public utilities bureau at various meetings. Further, Miner previously testified in Commission docket Nos. 18-1775 (Northern Illinois Gas Company, general rate increase) and 20-0810 (North Shore Gas, proposed rate increase for gas distribution service). Second, the accuracy of the Companies'

reconciliation statements was not contested and, therefore, the Attorney General did not sponsor a witness to perform an accounting review and to testify as to accounting matters; Miner's testimony addressed the prudence and reasonableness of the Companies' actions to pursue minimization and collection of uncollectibles. Third, Miner did not testify to any accounting/balance sheet matters or touch upon any matters related to GAAP. Fourth, as the Commission notes, the Companies did not move to strike Miner's testimony when the administrative law judge asked if there were any objections to the admission of her written testimony, although their witness questioned her qualifications in subsequent testimony and the Companies' counsel raised the issue at oral argument at the administrative hearing. See *La Salle Partners, Inc. v. Illinois Property Tax Appeal Board*, 269 Ill. App. 3d 621, 631 (1995) ("It is axiomatic that if an argument or objection is not made in an administrative proceeding, it is waived and may not be raised for the first time on administrative review.").

¶ 109                                III. CONCLUSION

¶ 110   For the reasons stated, we affirm the Commission's decision.

¶ 111   Affirmed.

*North Shore Gas Co. v. Illinois Commerce Comm'n*, **2024 IL App (2d) 230229**

| | |
|---|---|
| **Decision Under Review:** | Petition for review of order of Illinois Commerce Commission, Nos. 20-0665, 20-0666. |
| **Attorneys for Appellant:** | Christopher N. Skey, Elizabeth D. McErlean, and Elizabeth M. Rakoczy, of Quarles & Brady LLP, and Koby A. Bailey, of WEC Business Services LLC, both of Chicago, and James E. Goldschmidt and Mackenzie O'Connell, of Quarles & Brady LLP, of Milwaukee, Wisconsin, for petitioners. |
| **Attorneys for Appellee:** | Brian J. Dodds, Robert W. Funk, and Thomas R. Stanton, Special Assistant Attorneys General, of Chicago, for respondent Illinois Commerce Commission. |
| | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Leigh J. Jahnig, Assistant Attorney General, of counsel), for other respondent. |